IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
(HEARD IN NASHVILLE)

## STATE OF TENNESSEE v. DENNIS WADE SUTTLES

**Appeal from the Criminal Court for Knox County**
**No. 60819 Mary Beth Leibowitz, Judge**

---

**No. E1998-00088-SC-DDT-CD - Decided June 26, 2000**

---

The appellant, Dennis Wade Suttles, was convicted of first degree premeditated murder and sentenced to death for the killing. The Court of Criminal Appeals affirmed both his conviction and sentence. The case was docketed in this Court, and after a careful review of the record and the relevant legal authorities, we conclude that the evidence is sufficient to support the jury's finding of premeditation, the evidence is sufficient to support the jury's finding that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, and the sentence of death in this case is not excessive or disproportionate considering the circumstances of the crime and the defendant. Accordingly, the judgment of the Court of Criminal Appeals upholding the defendant's conviction and sentence is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the Court of Criminal Appeals Affirmed**

DROWOTA, J., delivered the opinion of the court, in which ANDERSON, C.J., HOLDER, and BARKER, JJ joined. BIRCH, J., filed a dissenting opinion.

Leslie M. Jeffress and Brandt Davis, Knoxville, Tennessee, for the appellant, Dennis Wade Suttles.

Paul G. Summers, Attorney General & Reporter, Michael E. Moore, Solicitor General, Marvin S. Blair, Jr., Assistant Attorney General, Randall E. Nichols, District Attorney General, S. Jo Helm and William Crabtree, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### Background

The defendant, Dennis Wade Suttles, was convicted of first degree premeditated murder and sentenced to death for the fatal stabbing of his estranged girlfriend, Gail Rhodes, in the parking lot of a Taco Bell Restaurant in Knoxville, Tennessee.

The proof introduced at the guilt phase of the trial showed that the defendant and the victim

met and began dating in April of 1995. The relationship progressed, and in October 1995 the defendant asked the victim to marry him. The victim's divorce was not final at that time, so the engagement was delayed. In December 1995, the defendant purchased a house, and the defendant, the victim, and her fifteen-year-old daughter, Christina, moved into the house together. At Christmas, the defendant gave the victim an engagement ring.

However, in February 1996, the victim moved out of the defendant's house after the two argued. Around the time of this argument, the victim's co-workers had noticed deep bruises on the victim's neck that looked like fingerprints. In his testimony, the defendant admitted that during the argument he tried to take the engagement ring from the victim's finger and broke the victim's necklace.

The defendant was distraught at the breakup of the relationship. He repeatedly sought to convince the victim to return to him. He called her repeatedly at work, sometimes waited for her at work, left cards on the windshield of her car, and attempted to speak with her whenever he saw her in public.

The victim appeared afraid of the defendant and tried to avoid him. She did not speak with him on the telephone when he called, and the victim's co-workers escorted her to her vehicle in the evening. In addition, the victim kept secret the location of her new residence and carried important personal papers, such as a deed to her burial plot, in her purse so that the papers could be easily located should something happen to her. The victim knew that in 1986, the defendant had pled guilty to one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder. She also knew that these convictions arose out of an incident where the defendant attempted to force his estranged former wife and his three-year-old son to return home with him. When his former father-in-law intervened, the defendant shot him. The defendant also assaulted a police officer who tried to apprehend him during this episode. The victim knew the circumstances of the previous convictions because she had accompanied the defendant on his monthly visit to his parole office on October 3, 1995. The parole officer told the victim the circumstances of the offenses and advised her to call if "anything unusual occurred."

On March 13, 1996, about one month after the break-up, the defendant, who was a foreman for a roofing company, worked his regular job. His co-workers testified that he was not angry or upset that day, did not make threatening remarks about the victim, and seemed his usual self. As he was driving home from work, he saw the victim drive by in her car with her daughter and her daughter's friend, Arlisa Tipton, but he lost her car when she drove into a residential neighborhood. The defendant then drove to his mother's house, where he was invited to eat supper. He accepted the invitation but decided that he would go to his own home first and shower and change clothes before supper. The defendant left his mother's home around 5:30 p.m., and he did not appear angry or upset at the time he left, nor did he say anything about the victim. The defendant's step-father operated a small engine repair shop and had repaired the motor in a piece of equipment, a leaf blower, that the defendant used on his roofing jobs. The defendant loaded the leaf blower in his car when he left his mother's home and said that he intended to use it on his roofing job the next day.

In the meantime, the victim, who had been aware that the defendant was following her and had deliberately eluded him, drove to a nearby Taco Bell restaurant to eat with Christina and Arlisa. According to Christina, the victim parked her car in the back of the restaurant so the defendant would not see the car if he drove past the front of the restaurant on Chapman Highway.

Unfortunately, on the way to his home, the defendant stopped at Wal-Mart on Chapman Highway which is located in the same shopping mall area as the Taco Bell where the victim was eating with Christina and Arlisa. The defendant intended to purchase some roofing supplies. The defendant was unable to find the products he needed, so he left Wal-Mart. As he was driving away from Wal-Mart toward Chapman Highway, he drove past the back of the Taco Bell and pulled into the restaurant when he noticed the victim's car. Parking his automobile beside the victim's vehicle, the defendant went inside the restaurant and attempted to speak with the victim. The two argued, and the defendant followed the victim and the girls outside.

The argument continued as the victim and the defendant stood beside the victim's automobile. Finally, the defendant grabbed the victim to prevent her from getting into her car. Placing one arm around the victim's neck, the defendant held a lock blade pocket knife to her throat. When Christina approached, the defendant said, "Get back or I'll kill her." Christina stepped back, and the victim told the defendant to put the knife away and she would go with him. The defendant put the knife in his pocket, apologized, and released the victim. When the victim fled toward the restaurant, the defendant followed, tackled the victim, pulled out his knife, slashed her throat and stabbed her multiple times. Christina, who witnessed the attack on her mother, testified:

> He cut her on her neck. He slit her neck all to pieces. And he stabbed her in the face and cut her lip and he cut her hair and he cut her body; he stabbed her. And I saw him flip her over and he stabbed her in the back. And that's all he–
>
> ***
>
> I was about three feet back because she kept telling me to get back and she kept screaming.

When he was finished, the defendant arose, wiped off his knife, returned it to his pocket, nonchalantly got into his car, and drove away. Christina testified that the defendant smiled at her as he drove by.

Amanda Reagan, an employee of Taco Bell, and Shawn Patrick Kane, a man who had just left the grocery store across the parking lot from Taco Bell, also witnessed the stabbing. According to these witnesses, after stabbing the victim, the defendant nonchalantly got into his car and drove away as if nothing of any great import had occurred. Both of these witnesses noticed the defendant's license plate number and gave it to police.

While they waited for an ambulance, Reagan, Kane, and an unidentified nurse, tried to help the victim as she lay helpless and bleeding in the parking lot. Attempting to stop or slow the bleeding, they applied pressure using towel and napkin compresses. The victim complained of choking and, when she tried to move, witnesses testified that the wound on her neck gaped open and

she started gurgling blood. Although Kane did not hear her say anything further after she complained of choking, he said she was still trying to move when she was being loaded into the ambulance. Reagan testified that as she was holding the stretcher while the victim was being loaded onto the ambulance, she heard the victim call out her daughter's name and saw the victim stretch out her hand as she was placed in the ambulance. The victim arrived by ambulance at the hospital at 6:26 p.m. and was pronounced dead at 6:35 p.m.

Around 7 p.m., the defendant called a friend, Donna Rochat. He told Rochat that he thought he had killed the victim after an argument in the parking lot of the Taco Bell. The defendant told Rochat that he had stabbed the victim in the back, cut her throat, and stabbed her in the chest. Rochat advised the defendant to surrender to police, but he said he could not do that. Rochat said the defendant seemed calm, but he commented that he would kill himself if he had a gun. The defendant also called his mother at some point after the stabbing and asked her to drive to the Taco Bell and determine if he had killed the victim.

Later that same evening, the police arrested the defendant as he approached his house on foot. The defendant had parked his car at a church parking lot about one mile from his home. The police described the defendant as cooperative and unemotional at the time he was apprehended. A knife with a wooden handle and approximately a three inch blade was found in the defendant's pocket at the time of his arrest.

Dr. Sandra K. Elkins, the Knox County Medical Examiner and a forensic pathologist, testified that the victim had suffered twelve major wounds inflicted with a sharp instrument such as a knife. These wounds included three stab wounds to the left side of her neck, a large gaping slash wound to the right neck, one stab wound just beneath her left breast, one stab wound to her left front shoulder, six stab wounds in her back. The victim also sustained an incise wound to the left side of her lips, defensive wounds to both hands and her right wrist, and superficial wounds underneath her chin. Dr. Elkins opined that the cause of death was multiple knife stab wounds. The immediate cause of death according to Dr. Elkins was bleeding from the jugular vein and external carotid artery, which were cut by the slash wound to the right neck. The other major wounds would have also potentially caused death given enough time and no medical treatment. Dr. Elkins also opined that the victim was alive when the wounds were inflicted, that she remained able to speak, because the injury to her larynx from the slash wound to the right side of her neck did not damage her vocal cords, that she would have fallen unconscious in about five to six minutes, and that she would have bled to death within ten minutes as a result of the slash wound to the right side of her neck. However, Dr. Elkins opined that application of pressure to the wound on the right side of the victim's neck may have extended consciousness and delayed the time of death by five minutes.

The defendant testified at trial. According to the defendant, while he and the victim were talking beside her car, the victim told him that, if he did not stay away, she would have him killed. He then grabbed her and told her not to threaten him. While admitting that he put a knife to the victim's throat, he denied that he intended to hurt her and claimed that he was only reacting to the victim's threat. The defendant testified that, when he released the victim and apologized, she told him he was a dead man. The defendant testified he did not remember anything that happened after

-4-

the victim threatened him the second time. He claimed that he did not regain his memory until weeks after the murder.

During the defendant's testimony it was revealed that he had previously pled guilty to one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder. As previously stated, the victims of these offenses were his former father-in-law, his ex-wife, his three-year-old son, and a police officer who was attempting to apprehend him. The offenses occurred when the defendant tried to force his former wife, who had left him, to return home. The victim was aware of the defendant's prior convictions.

The defendant's stepfather testified that during the years that he had known the defendant he had never seen him angry or upset, and he described the defendant as a calm and easygoing person. Dr. Jerry Matthews, a clinical psychologist who had evaluated the defendant on three separate occasions, in 1991 and 1993 for the Tennessee Board of Paroles and in 1996 for the defense, testified about the defendant's mental condition. According to the history related to Dr. Matthews, the defendant had been a "blue baby" when he was born. His older brother died of suffocation at the age of five. His father left the family when the defendant was four, and the defendant was raised by his paternal grandparents, who were strict, religious people. The defendant dropped out of school in the tenth grade and went to work. His one marriage lasted twelve years and produced one child.

In 1991, Dr. Matthews concluded that the defendant presented a substantial risk of violent behavior if released on parole, particularly if he was involved in a heterosexual relationship. Dr. Matthews described the defendant as someone who acts impulsively, without thought or reflection, and who, frightened of being alone, becomes anxious and potentially violent when unable to control his environment. According to Dr. Matthews the defendant's behavior was attributable to the oxygen deprivation he suffered as a "blue baby" and to his abandonment as a child. Between 1991 and 1993, the defendant attended anger management classes in prison. He was released on parole in 1994.

Dr. Matthews opined that at the time of the homicide the defendant was in a state of heightened emotional arousal, that he put the knife to the victim's throat to convince her to come back to him, and that he released her when she reassured him. Accepting the defendant's version of the offense, Dr. Matthews said that the victim's threat to have the defendant killed was "the straw that broke the camel's back." Dr. Matthews opined that the killing was not premeditated and was instead "an impulsive and explosive act of violence" caused by "basic, primitive emotions of anger and fear and hurt, all mixed together."

In rebuttal, the State recalled Christina who testified that her mother did not threaten the defendant, as he had claimed, before he stabbed her.

Based upon this proof, the jury found the defendant guilty of premeditated first degree murder. At the sentencing phase, the State relied upon the proof presented at the guilt phase, and also offered into evidence the indictments and judgments from the defendant's four previous convictions for assault. These showed that on January 6, 1986, in Sevier County, Tennessee, the

defendant pleaded guilty to one count of felonious assault with bodily injury and enhancement for use of a firearm (sentence 30 years plus 5 years for enhancement) and to three counts of assault with intent to commit first degree murder by use of a firearm (three 5-year concurrent sentences).

The defendant presented records from his earlier imprisonment in the Department of Correction to show that he had been a model inmate. For example, these records showed that at the time of his parole he received recommendations from twenty-nine staff members at the correctional center and that the warden and associate warden recommended parole. He worked during his entire imprisonment, was not violent and reached "trusty" status. During his incarceration, the defendant received two write-ups: one for having contraband (tools) in his cell and the other for violating policy and procedures by possessing a fan from which the name and inmate number had been scrubbed.

The defendant's mother, Lois Evelyn Napier, testified that the defendant was born breach and was a "blue baby." After the defendant's father left, the defendant lived with his paternal grandparents because his mother was working two jobs and could not care for him. The defendant was not involved in any trouble as a child. During his imprisonment, Mrs. Napier visited her son weekly. After his release on parole, he lived with his mother and her husband and caused no trouble. The defendant called his mother on the night of the murder and asked if she would go to the Taco Bell to see if the victim was alive. Ms. Napier testified that she loved her son very much and wanted to help him. The defendant was forty-four years old at the time of the murder.

Based upon the proof presented at the sentencing phase of the trial, the jury found the following two aggravating circumstances: (1) that the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; and (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See Tenn. Code Ann. § 39-13-204(i)(2) and (5). Finding that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction of premeditated first degree murder and his sentence of death, raising numerous claims of error. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the defendant's conviction and sentence. Thereafter, pursuant to Tenn. Code Ann. § 39-13-206(a)(1),[1] the case was docketed in this Court.

---

[1] "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court entered an Order setting the cause for oral argument at the May 2000, term of Court in Nashville, and limiting oral argument to four issues. See Tenn. S. Ct. R. 12.[2]

For the reasons explained below, we conclude that none of the alleged errors have merit. Moreover, we have determined that the evidence supports the jury's findings as to aggravating and mitigating circumstances, that the sentence of death was not imposed in any arbitrary fashion, and that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Accordingly, the defendant's conviction for first degree murder and sentence of death are affirmed.

### Sufficiency of the Evidence - Premeditation

The defendant argues that the evidence presented by the State was not sufficient to support the jury's verdict of premeditated first degree murder. The State maintains that the evidence was sufficient to support the jury's verdict.

It is well-settled that the proper inquiry for an appellate court determining the sufficiency of the evidence to support a conviction, is whether, "considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id. A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; See also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Therefore, on appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. Hall, 8 S.W.3d at 599; Bland, 958 S.W.2d at 659.

At the time this offense was committed, first degree murder was defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1)(Supp. 1995). Section 39-13-202(d) provided then as it does now:

---

[2]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

As used in subdivision (a)(1) 'premeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The defendant argues that the State presented no evidence that he premeditated killing the victim before the confrontation at the Taco Bell. He says that the death of the victim was not the result of premeditation but of "an overpowering rage at finally realizing that [the victim] was not returning to appellant's home, that he had lost yet another woman whom he had cared about deeply and in whom he had invested all he had, and for reasons appellant could not understand." The defendant relies upon the testimony of Dr. Matthews to support his argument. As previously stated, Dr. Matthews opined that the killing was not premeditated and was instead "an impulsive and explosive act of violence" caused by "basic, primitive emotions of anger and fear and hurt, all mixed together."

The element of premeditation is a question of fact to be resolved by the jury. Bland, 958 S.W.2d at 660. It may be established by proof of the circumstances surrounding the killing. Id.; State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992). As we stated in Bland, there are several factors which tend to support the existence of premeditation which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

Considering the proof in this record in the light most favorable to the State, as we are required to do, we agree with the Court of Criminal Appeals that the evidence is legally sufficient to support the jury's verdict of premeditated first degree murder. The record reflects that the defendant grabbed the unarmed victim when she refused to go home with him and held a pocket knife to her throat. When the victim's daughter got out of the car and approached the couple, the defendant told her to "Get back or I'll kill her." After the victim told the defendant she would go with him, the defendant released her, closed the knife, and put it back into his pocket. When the victim then attempted to flee to the safety of the Taco Bell, the defendant chased her, tackled her, took out his knife, opened it, slashed her throat, and stabbed her several times while she lay helpless on the ground, and then, turned the victim over and stabbed her several more times. When the attack was over, the defendant got up, wiped the knife on his pants to remove the blood, then "nonchalantly" walked across the parking lot to his car, and drove out of the parking lot, smiling at the victim's daughter as he passed. Less than one hour after the assault, the defendant telephoned a friend and calmly described the assault, saying that he had cut the victim's throat and had stabbed her in the chest and in the back. The defendant parked his car at a church one mile from his home in an apparent effort to conceal the crime. When the defendant was taken into custody, he was

described as "unemotional" and "indifferent." Attempting to negate the element of premeditation, the defendant claimed that he had not closed the knife and placed it back in his pocket after releasing the victim, and offered the testimony of Dr. Matthews that the killing was an impulsive act rather than an act of premeditation. As previously explained, however, whether a killing is premeditated is a question of fact for the jury to decide. The jury was in a position to evaluate the testimony of both the defendant and Dr. Matthews in this case and obviously accredited the State's witnesses when it returned a verdict of guilty of first degree premeditated murder. Again, as previously noted, a guilty verdict by the jury accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory. We agree with the Court of Criminal Appeals that, while the proof does not necessarily reflect that the defendant intended to kill the victim when he initially stopped at the Taco Bell, the proof is sufficient to support the jury's finding that the defendant acted with premeditation at the time of the murder. Accordingly, the defendant's challenge to the sufficiency of the evidence to support the jury's finding of premeditation is without merit.

### Sufficiency of the Evidence - Aggravating Circumstance (i)(5)

The defendant next claims that the proof is not sufficient to support the jury's finding that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). In response, the State says that the proof, considered in the light most favorable to the prosecution, supports the jury's finding of this aggravating circumstance. In determining whether the evidence supports a jury's finding of a statutory aggravating circumstance, the proper inquiry for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. See State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999).

This Court has previously held that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Pike, 978 S.W.2d 904, 917 (Tenn. 1998); State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). With respect to "serious physical abuse beyond that necessary to produce death," we have previously explained that "serious" alludes to a matter of degree, and that the physical, rather than mental, abuse must be "beyond that" or more than what is "necessary to produce death." See State v. Nesbit, 978 S.W.2d 872, 887 (Tenn. 1998); State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996). This aggravating circumstance may be applied if the evidence is sufficient to support either torture or serious physical abuse beyond that necessary to produce death. See State v. Hines, 919 S.W.2d 573, 587 (Tenn. 1993) (". . .review of the record establishes, this aggravating circumstance was sufficiently proved by evidence of torture independent of depravity."); State v. Van Tran, 864 S.W.2d 465, 478 (Tenn. 1993) (holding that trial court did not err in charging only that portion of the aggravating circumstance which was supported by the proof because the aggravating circumstance is written in the disjunctive and may be found if either torture or depravity of mind is established); State v. O'Guinn, 709 S.W.2d 561, 567 (Tenn. 1986) ("Although a murder victim must be alive in order to be tortured, a victim need not have been alive in order to demonstrate the perpetrator's depravity of mind . . . ."); State v. Williams, 690 S.W.2d 517, 529-30 (Tenn. 1985) ("However, we hold that 'depravity of mind' may, in some circumstances, be shown although torture, as hereinabove defined,

did not occur."). See also State v. Soto-Fong, 928 P.2d 610, 626 (Ariz. 1996) (stating that proof beyond a reasonable doubt of any one of the three components of the aggravating circumstance, cruelty, heinousness, or depravity, is sufficient to support a finding of the aggravating circumstance); State v. Bjorklund, 604 N.W.2d 169, 215 (Neb. 2000) (stating that the aggravating circumstance, the murder was especially heinous, atrocious, cruel or manifested exceptional depravity by ordinary standards of morality and intelligence, contained two separate disjunctive components which may operate together or independently of one another); Byford v. State, 994 P.2d 700, 716 (Nev. 2000) (stating that establishing either torture or mutilation is sufficient to support the jury's finding of the aggravating circumstance); Goins v. Commonwealth, 470 S.E.2d 114, 130 (Va. 1996) (stating that proof of any one of the three statutory components, torture, depravity of mind, or an aggravated battery to the victim, will support a finding of the aggravating circumstance). Considering the proof in this record in a light most favorable to the prosecution, we conclude that the evidence is sufficient to support a finding of both torture and serious physical abuse beyond that necessary to produce death.

In this case, the defendant attacked the victim with a knife and inflicted twelve major wounds on the victim. The medical testimony indicated that the victim was alive when all the wounds were inflicted and that none of the major wounds, either individually or collectively, would have caused the victim to lose consciousness immediately. Indeed, Dr. Elkins testified that the victim would have bled to death in approximately ten to fifteen minutes and would have lost consciousness in approximately five to eleven minutes, depending upon whether pressure was applied to the wound. Witnesses to the attack also testified that the victim was alive and conscious at the time the wounds were inflicted and for sometime thereafter. Witnesses testified that the victim was screaming and warning her daughter to stay back during the attack. Moreover, the victim had defensive wounds on her hands, suggesting that she was conscious during the attack and attempting to protect herself. Shortly after the attack ended, witnesses heard the victim complain that she was choking. When the victim attempted to move her head so she could breathe, witnesses saw the slash wounds on her neck gape open and heard the victim "gurgling blood." Finally, witnesses said the victim was still attempting to move when she was placed in the ambulance, and one witness testified that she both observed the victim reach out her hand and heard the victim call her daughter's name as she was being loaded into the ambulance. Considered in the light most favorable to the prosecution, this evidence is certainly sufficient to establish torture, i.e., the infliction of severe physical or mental pain upon the victim while she remained alive and conscious.

Moreover, we agree with the Court of Criminal Appeals that the evidence in this record is sufficient to support the jury's finding of serious physical abuse beyond that necessary to produce death. Dr. Elkins testified that the cause of death was the slash wound to the right side of the victim's neck. Dr. Elkins also testified, however, that the other wounds would have eventually produced death had the victim not been given timely medical attention. As the Court of Criminal Appeals concluded, the evidence is sufficient to support the jury's finding that the brutal physical attack upon the victim was excessive and far beyond that necessary to produce death. Accordingly, we conclude that the evidence is sufficient to support the jury's determination that the "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."

## Constitutionality of Death Penalty - Electrocution and Lethal Injection

The defendant asserts that "death imposed by electrocution, or by any means," is cruel and unusual punishment in violation of both the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution.

This Court has previously rejected the argument that death by electrocution is cruel and unusual punishment. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993); State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993); State v. Bane, 853 S.W.2d 483, 489 (Tenn. 1993); State v. Black, 815 S.W.2d 166, 179 (Tenn. 1991). We continue to adhere to the view expressed in those decisions and therefore reject the defendant's assertion that death by electrocution is cruel and unusual punishment.

However, in his brief in the Court of Criminal Appeals and his initial brief in this Court, the defendant mentioned in passing that execution by lethal injection also constitutes cruel and unusual punishment. After noting that no Tennessee Court had addressed the issue because lethal injection had not been an option in Tennessee until 1998, the Court of Criminal Appeals, citing cases from other jurisdictions concluded "that lethal injection is not constitutionally prohibited." We initially requested supplemental briefing and oral argument on the question of whether lethal injection constitutes cruel and unusual punishment under the Eighth Amendment. However, after further consideration of the record and circumstances of this case, we have concluded that a determination of the constitutionality of lethal injection in this case would deprive this defendant of an opportunity to fully and fairly litigate this issue. In this case, the issue can be raised and determined in a petition for post conviction relief.

Lethal injection was not a method of execution in Tennessee at the time the defendant was tried and sentenced. Accordingly, the defendant had no opportunity to specifically challenge and litigate the constitutionality of lethal injection in the trial court. In 1998, following the defendant's trial, the General Assembly enacted legislation which afforded to defendants sentenced to death the option of choosing lethal injection as the method of execution. See 1998 Tenn. Pub. Acts 982 (effective May 18, 1998) (amending Tenn. Code Ann. § 40-23-114). Recently, the General Assembly enacted legislation which adopted lethal injection as the default method of execution in Tennessee. See 2000 Tenn. Pub. Acts 614 (effective March 30, 2000) (amending Tenn. Code Ann. § 40-23-114). Even though this defendant had no opportunity to challenge the constitutionality of lethal injection prior to his trial and sentencing, the State in its supplemental brief argues that this Court should declare lethal injection a constitutional method of execution. In support of its argument, the State points out that thirty-six states utilize lethal injection as a method of execution, that cases from many other jurisdictions have upheld the constitutionality of lethal injection as a method of execution,[3] and that lethal injection has been upheld each and every time a defendant has

---

[3]See Felder v. Johnson, 280 F.3d 206 (5th Cir. 1999); LaGrand v. Stewart, 133 F.3d 1253 (9th Cir. 1998); Tipton v. United States, 90 F.3d 861 (4th Cir. 1996); State v. Hinchey, 890 P.2d 602 (Ariz. 1995); People v. Samoya, 938 P.2d 2 (Cal. 1997); State v. Webb, 252 Conn. 128 (2000); State

raised a cruel and unusual punishment challenge. Although we appreciate the thorough legal research provided by the State, we decline to determine the constitutionality of lethal injection in this appeal. In light of the fact that lethal injection became a method of execution in Tennessee only after this defendant was tried and sentenced, we conclude that a determination of the constitutionality of lethal injection in this case would deprive this defendant of an opportunity to fully and fairly litigate this issue. In this case, the issue can be raised and determined in a petition for post conviction relief.[4]

## Comparative Proportionality Review

Finally, we consider whether the defendant's sentence of death is comparatively disproportionate considering the nature of the crime and the defendant. We begin, as always, with the proposition that the sentence of death is proportional to the crime of first-degree murder. State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). Comparative proportionality review of capital cases is designed to insure "rationality and consistency in the imposition of the death penalty." Bland, 958 S.W.2d at 665. A death sentence will be considered disproportionate if the case, taken as a whole, is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Id. However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. State v. Smith, 993 S.W.2d 6, 17 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 281 (Tenn. 1998); Bland, 958 S.W.2d at 665. Our role in conducting proportionality review is not to assure that a sentence "less than death was never imposed in a case with similar characteristics." Blanton, 975 S.W.2d at 281; Bland, 958 S.W.2d at 665. "'Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.'" Bland, 958 S.W.2d at 665 (quoting Gregg v. Georgia, 428 U. S. 153, 203, 96 S. Ct. 2909, 2939, 49 L. Ed.2d 859 (1976)). Instead, our duty in conducting proportionality review "is to assure that no aberrant death sentence is affirmed." Bland, 958 S.W.2d at 665.

In performing this duty, we do not utilize a mathematical formula or scientific grid. The test is not rigid. Id. To conduct proportionality review, we select from the pool of cases in which a

---

v. Deputy, 648 A.2d 423 (Del. 1994); State v. Sivak, 674 P.2d 396 (Idaho 1983); People v. Stewart, 520 N.E.2d 384 (Ill. 1988); Miller v. State, 623 N.E.2d 403 (Ind. 1993); Romano v. State, 917 P.2d 12 (Okla. 1996); State v. Moen, 786 P.2d 11 (Or. 1990); Ex Parte Granviel, 561 S.W.2d 503 (Tex. Crim. App. 1978); In re Pirtle, 965 P.2d 593 (Wash. 1998); Hopkinson v. State, 798 P.2d 1186 (Wyo. 1990).

[4]We emphasize that our holding allowing the defendant in this case to challenge the constitutionality of lethal injection in a post conviction petition is based upon the particular circumstances of this case.

capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. Bland, 958 S.W.2d at 666. "'[B]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination.'" Bland, 958 S.W.2d at 666 (quoting Tichnell v. State, 468 A.2d 1, 15-16 (Md. 1983)). In choosing and comparing similar cases, we consider many variables, some of which include, (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667. When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id.

Applying these factors, we note that the proof in this case reflects that the defendant and the victim had been estranged and living apart for about a month prior to this killing. During that time the defendant repeatedly tried to contact the victim, by telephone, in writing, and in person, to convince her to return to the house they had lived in together. The victim was clearly frightened of the defendant, and as a result, kept her place of residence and her home telephone number secret, and she kept important papers in her purse in the event something happened to her. When the defendant happened upon the victim at Taco Bell on the day of the offense, he attempted to convince the victim to reconcile with him and move back into the house with him. The defendant followed the victim outside, although she was refusing to discuss the matter with him, and when she attempted to get into her car to leave, the defendant grabbed the victim, pulled out his knife, and held it to her throat, apparently intending to force her to go with him. When the victim's daughter attempted to intervene, the defendant told her to "Get back or I'll kill her." At that point, the victim agreed to go with the defendant and asked him to put the knife away. When the defendant had released the victim and put the knife away, the victim fled toward the Taco Bell, and the defendant pursued her, tackled her, pulled his knife from his pocket, opened it, stabbed her repeatedly, then turned her over and continued to stab her. While the victim's daughter watched in horror, the defendant inflicted twelve major stabs wounds, any one of which could have potentially caused death, upon the victim, one of which severed both her jugular vein and her exterior carotid artery. The defendant also inflicted various superficial wounds upon the victim. The victim fought against the attack as is evidenced by the defensive wounds on her hands, and she sought to protect her daughter as well by verbally warning her daughter to stay back. Although the defendant and the victim had argued, there is no proof that the victim was armed nor that the killing was justified. Although the defendant testified that the victim had threatened him prior to the attack, the victim's daughter denied that her mother had made any such threat, and the jury credited the testimony of the victim's daughter. Therefore, there is no proof that the defendant was provoked. Indeed, the record reflects that the victim was attempting to end the encounter by fleeing into the restaurant.

The defendant, a white male, was forty-four years of age at the time of murder. As we have previously stated, the evidence is sufficient to support the jury's finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Moreover, the evidence was clearly sufficient to establish that the defendant had been previously convicted of felony offenses, the statutory elements of which involve the use of violence to the person. The defendant had been previously convicted of four felony offenses whose statutory elements involved the use of violence to the person including one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder by use of a firearm. While Dr. Matthews testified that the defendant acts impulsively, without thought or reflection, is frightened of being alone, and becomes anxious and potentially violent when unable to control his environment, there was no evidence to suggest that the defendant was unable to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. The record reflects that the defendant was cooperative with the police when they apprehended him at his home. Although the defendant told two individuals that he had stabbed and probably killed the victim, there is no proof that he exhibited any remorse for his actions. Indeed, the proof indicates that he smiled at the victim's daughter as he drove past the victim's body.

We have reviewed and upheld the death sentence in numerous cases bearing similarity to the present case. For example, in the following cases, the sentence of death was imposed and upheld where the defendant had killed an estranged wife or girlfriend in a domestic violence context. State v. Keough, ___ S.W.3d __ (Tenn. 2000) (after arguing in a bar, the defendant followed the victim, his estranged wife, outside, stabbed her with a bayonet knife, and left her to bleed to death inside the car, and the single aggravating circumstance was (i)(2)); State v. Hall, 8 S.W.3d 593 (Tenn. 1999) (beating, strangulation and drowning death of estranged wife; children were present during part of the assault; one of the aggravating circumstances was (i)(5)); State v. Hall, 958 S.W.2d 679 (Tenn. 1997) (angered by his girlfriend's decision to leave him, the defendant searched for her, and set fire to her car when she was inside; aggravating circumstance (i)(5) was found); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (killing of estranged wife, aggravating circumstance (i)(5) was found); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987) (killing of estranged wife by suffocation, aggravating circumstances (i)(2) and (i)(5) were present); State v. Cooper, 718 S.W.2d 256 (Tenn. 1986) (defendant deliberately shot estranged wife after threatening her and stalking her for some time; aggravating circumstance (i)(5) was found). We have also upheld the death sentence in cases where the means and manner of death was stabbing. See, e.g., Keough, __ S.W.3d at __; State v. Mann, 959 S.W.2d 503 (Tenn. 1997); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989). Finally, we have upheld death sentences imposed on defendants who were of similar age to the defendant. See Keough, __ S.W.3d at __; State v. Wilcoxson, 772 S.W.2d 33 (Tenn. 1989); State v. Barnes, 703 S.W.2d 611 (Tenn. 1985).

Our research reveals that a lesser sentence has been imposed in similar cases involving the killing of estranged wives or girlfriends. See, e.g., State v. Dick, 872 S.W.2d 938 (Tenn. Crim. App. 1993); State v. Weems, No. 02C01-9401-CR-00011 (Tenn. Crim. App., at Jackson, July 26, 1996); State v. King, C.C.A. No. 4 (Tenn. Crim. App., at Jackson, Feb. 10, 1988). However, these cases are distinguishable in that the defendant had not been previously convicted of violent felony offenses. Moreover, our function is not to invalidate a death sentence merely because the

circumstances may be similar to those in which a defendant received a less severe sentence. Instead, our review requires a determination of whether a case plainly lacks circumstances found in similar cases where the death penalty has been imposed. Bland, 958 S.W.2d at 665. Here, the similarity of the circumstances to cases in which the death penalty has been imposed reveals that the penalty is not arbitrary or disproportionate as applied in this case.

### Conclusion

In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge Joe G. Riley and joined in by Presiding Judge Gary R. Wade and Judge David H. Welles. Relevant portions of that opinion are attached hereto as an appendix. The defendant's sentence of death is affirmed and shall be carried out on the 30th day of October, 2000, unless otherwise ordered by this Court or proper authority.

It appearing that the defendant Dennis W. Suttles is indigent, costs of this appeal are taxed to the State.

-15-