# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 13, 2005

## STATE OF TENNESSEE v. CHRISTOPHER PERRY

**Appeal from the Criminal Court for Shelby County**
**No. 03-08489     Carolyn Wade Blackett, Judge**

---

**No. W2004-03004-CCA-R3-CD  - Filed December 22, 2005**

---

The Appellant, Christopher Perry[1], was convicted by a Shelby County jury of the first degree murder of Stanley Johnson and was sentenced to life imprisonment.  On appeal, Perry raises the following issues for our review: (1) whether the evidence was sufficient to support the verdict and (2) whether the trial court erred in denying a motion to suppress in violation of his Fifth and Sixth Amendment rights.  After review, we conclude the convicting evidence supports the verdict.  Moreover, we affirm the trial court's order denying Perry's motion to suppress his statement upon Fifth Amendment grounds.  However, we vacate the trial court's denial of Perry's motion to suppress upon Sixth Amendment right to counsel protections because no findings were entered by the trial court upon the factual disputes presented.  Accordingly, the trial court's denial of Perry's Motion to Suppress is vacated, as is the judgment of conviction, with remand for a suppression hearing consistent with this opinion.

**Tenn. R. App. P. 3; Judgment of Conviction Vacated**
**and Remanded for Suppression Hearing**

DAVID G. HAYES, J., delivered the opinion of the court, in which GARY R. WADE, P. J., and THOMAS T. WOODALL, J., joined.

Gregory Thomas Carman (on appeal), Memphis, Tennessee; and Jake Werner (at trial), Memphis, Tennessee, for the Appellant, Christopher Perry.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William L. Gibbons, District Attorney General; Charles Bell and Alexia Fulgham, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

---

[1]At several points in the transcript of evidence, the Appellant is referred to as Chris Colehill.

On the night of July 29, 2003, in the aftermath of a storm which downed power lines and caused a blackout in Shelby County for several days, the Appellant stopped at his aunt's house at 1160 James Street in Memphis to check on his mother. After entering the house for a short time, the Appellant returned to the front porch and noticed that the hood of his red and white 1982 Dodge truck was up and that someone was under the hood. The Appellant ran toward the victim, whom he did not know, hitting the victim with a plastic porch chair. The victim, Stanley Johnson, attempted to flee; however, the Appellant chased after him and upon catching the victim, the two "tussl[ed] for a while[,] and then they let each other go." The victim attempted to explain to the Appellant that he was not trying to steal the truck's radio, rather he was only checking to see if the radio worked. Wires, however, could be observed hanging from the space which had housed a radio. The Appellant, whose demeanor was described as "fired-up, mad, angry," told the victim that he was "a walking dead man." The Appellant then got into a white Dodge truck[2] and drove to his mother's house on Castilia Street, where he also resided.

Upon reaching his mother's house, the Appellant found his brother, his girlfriend, and several friends present, as the residence was in one of the few areas of Memphis that still had electricity. Those present described the Appellant as acting "wild, crazy, and just losing his mind," as he explained to the group that he had caught someone stealing the radio from his truck. The Appellant was overheard stating that "he was going to finish the boy off." He then secured a 9 mm pistol from his room and asked his girlfriend, Danielle Hardin, to accompany him as he returned to the James Street address to return his mother home.

As the Appellant was approaching James Street, he noticed a person on the street and stopped his truck. Although the street lights provided no illumination, the Appellant recognized the person as the man who had earlier stolen the truck radio. As the man reached for an object tucked beneath his arm, the Appellant ran toward the man with his pistol, firing as he ran. The victim collapsed to the ground. The Appellant ran back to his truck and quickly left the scene. He then drove to the home of his friend Brian Turner, where he asked to leave the gun to avoid getting "a weapons charge." The Appellant explained to Turner that someone had attempted to break into his truck and that he had been in a fight and had fired the gun.

The following day Turner learned that a shooting had occurred the previous night, and he returned the gun to the Appellant's home, placing it in a boat near the back door. Shortly thereafter, the pistol was found in the boat by a family member, and several of the Appellant's friends disposed of the weapon in Martin Luther King Park in a location near the Mississippi River.

On July 29th, Darren Boyce with the Crime Scene Department of the Memphis Police was called to the crime scene and found the victim's body in the middle of James Street on his stomach with his hands to the side. Four 9 mm shell casings were also found at the scene. On July 31st, Officer Frank Sousoulas with the Memphis Police Department was directed to Martin Luther King

_____

[2]The record suggests that the Appellant returned to his mother's house on Castilia Street in a white Dodge truck owned by his grandmother.

Park where he recovered a 9 mm Beretta semiautomatic on an embankment sloping toward the Mississippi River. Shelby County Medical Examiner, Doctor O. C. Smith, who performed an autopsy on the victim, testified that the victim died from a gunshot wound to the back of the head.

On July 30, 2003, the Appellant's mother advised her son to report to the police department, at which time the Appellant gave a statement to Memphis Police Officer James Howell. The Appellant was Mirandized and signed an advice of rights form. In this statement the Appellant denied any responsibility for the victim's death or possessing a firearm.

While at the dentist's office recovering from three root canals on August 4, 2003, the Appellant was arrested for the murder of Stanley Johnson. He was again informed of his *Miranda* rights. On this date, the Appellant gave a statement to Sergeant Sims of the homicide bureau admitting that he did shoot the victim with a 9 mm pistol; however, he claimed that the shooting was accidental.

The Appellant was indicted by a Shelby County grand jury in November of 2003 for first degree murder. An evidentiary hearing on the Appellant's Motion to Suppress his August 4th statement was held on October 26, 2004, which was denied. Trial commenced the following day, with the jury returning a guilty verdict for first degree murder on October 29th. The Appellant was sentenced to a term of life imprisonment. A motion for new trial was filed on December 15, 2004, which was denied. Notice of appeal was filed December 20, 2004.

**Analysis**

## I. Sufficiency of the Evidence

The Appellant asserts that the proof adduced at trial would only justify a finding of second degree murder or voluntary manslaughter. The Appellant does not contest the fact that he shot the victim but claims that he fired the shots "in a misguided effort at self-defense." He contends that the homicide was not premeditated because of his lack of a prior relationship with the victim and his knowledge of the history of violence in the neighborhood.

In considering this issue, we apply the rule that where the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court will not reweigh or reevaluate the evidence presented. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

First degree murder is defined in pertinent part as the "premeditated or intentional killing of another." T.C.A. § 39-13-202(a)(1) (2003). Tennessee Code Annotated section 39-13-202(d) provides:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation.

T.C.A. § 39-13-202(d). Therefore, in order to convict the Appellant of the indicted offense, the State was required to prove beyond a reasonable doubt that he killed Johnson with "premeditation." Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the commission of the crime. *State v. Berry*, 141 S.W.3d 549, 565-66 (Tenn. 2004); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). There are several factors which tend to support the existence of premeditation including: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; and (6) calmness immediately after the killing. *Suttles*, 30 S.W.3d at 261.

The proof established at trial that after the Appellant caught the victim in the act of stealing the truck radio, a scuffle ensued, and the Appellant advised the victim that he was "a walking dead man." The Appellant then returned home and procured his 9 mm pistol and went back to the area where he had last encountered the victim. Before returning to the scene, the Appellant had informed others, "I'm fixing to go over here and finish this boy off." After encountering the victim, the Appellant got out of his truck and began to run toward the victim who was attempting to flee. The Appellant began firing at the victim, with the fatal bullet striking the victim in the back of his head. After the killing, the Appellant acted "normal," "like nothing happened." The Appellant then attempted to hide the murder weapon by leaving it at a friend's house. We conclude from these facts that the proof would have permitted a rational juror to find premeditation and that the Appellant was sufficiently free from excitement and passion to be capable of premeditation.

## II. Motion to Suppress

The Appellant argues that the trial court should have suppressed his August 4, 2003 statement because it was involuntarily given, and, as such, violated "his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, § 8 of the Tennessee Constitution." Specifically, he asserts that he made the statement in pain "after spending eight and one half hours at the dentist's office undergoing three root canals" and while heavily medicated for these procedures as well as for migraine headaches and depression.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Furthermore, the State, as the prevailing party, is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. *Id*. In reviewing a trial court's ruling on a motion to suppress, this court may consider proof adduced at both the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

With regard to the voluntariness of a confession, "[t]he law in this state is well-established that '[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary.'" *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000) (quoting *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980), *cert. denied* 454 U.S. 1096, 102 S. Ct. 667 (1981)). "It is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." *Id.* (citations omitted). If a defendant understands his or her rights and is capable of making a narrative of past events, the use of alcohol does not prevent the admission of the statement. *State v. Michael Abernathy*, No. 03C01-9111-CR-00372 (Tenn. Crim. App. at Knoxville, Oct. 2, 1992). We apply the test of whether the accused, at the time of the statement, could narrate past events or relate his role in the commission of the crime. *Id.*

The proof at the suppression hearing established that the Appellant was at his dentist's office on August 4th from 8:00 a.m. until 4:30 p.m. He testified that his dentist had performed three root canals and that the dentist had administered pain medication during the procedure. In addition, he related that he had taken "migraine medication" for a migraine headache that morning and had also taken prescribed "depression medication." Without distinguishing their medical purposes, he described the medication which he took that day as Amitrptyline, Hydrocodone, Railpex (phonetically), Ibuprofen 800, and another medication he could not pronounce. The Appellant was sitting in the lobby of the dentist's office at 4:30 p.m. because he was feeling "groggy" and the dentist had told him to "just sit down for a minute." At 4:30 p.m., the police appeared at the dentist's office, and he was promptly arrested. The Appellant was transported to the homicide office at 201 Poplar for questioning. The statement indicates that the Appellant's statement to Sergeant Sims began at 5:15 p.m. and was concluded at 6:05 p.m.

With regard to the waiver of his right not to incriminate himself and his right to counsel, the Appellant testified that he was unable to make an intelligent decision because he was in extreme pain, he was crying, he was not "clear-headed," and he was "half-way under." The proof also indicated that the twenty-two-year-old Appellant, who completed the eleventh grade, had no prior arrest record.

The proof at the suppression hearing established that approximately two months prior to the suppression hearing, Sergeant Sims was killed in a boating accident. Sergeant Ernestine Davison,

a twenty-two-year veteran of the police department's homicide bureau, however, was present during the taking of the Appellant's statement. Sergeant Davison testified that she was also present when Sergeant Sims advised the Appellant of his Fifth Amendment rights and that the Appellant initialed his acknowledgment of those rights. Davison related that the Appellant never requested a lawyer during her presence. She noted that the Appellant initiated the conversation and was responsive to questions. Additionally, Davison stated that the Appellant did not appear to be under the influence of drugs or alcohol, complain of pain, or state that he was on any type of medication.

Moreover, at trial, Sergeant Fitzpatrick testified that he was present with Sergeant Sims at the beginning of the interview session with the Appellant. He further stated that "we gave him his rights" and that the Appellant indicated he understood his rights and he agreed to talk. Fitzpatrick testified that he observed nothing unusual about the Appellant's demeanor and stated that the Appellant did appear to be under the influence of alcohol or narcotics. Fitzpatrick testified that his participation in the interview ended when the Appellant asked to speak to Sergeant Sims alone.

In denying the motion to suppress the statement, the trial court concluded:

Based upon the testimony that I've heard, whether or not the statement was given voluntarily, knowingly, and intelligently as a result of the root canal, there hasn't been any evidence that there was any medication that was so severe that he could not understand, speak and go forward with the statement.

We are unable to conclude that the evidence preponderates against the trial court's finding that the statement was given voluntarily, knowingly, and intelligently.

In a second challenge to the trial court's denial of the motion to suppress, the Appellant argues that his statement was taken in violation of his Sixth Amendment rights. In his pre-trial motion to suppress, the Appellant specifically asserted that at the time of his statement, he had been placed under arrest for first degree murder, and, as such, his Sixth Amendment right to counsel had attached. Thus, he argues as the result of the denial of his request for counsel, his statement was taken in violation of his Sixth Amendment rights.

The Appellant asserts that during a pre-statement interview period with Sergeant Sims, he advised Sergeant Sims that he had nothing to say, that his lawyer was on the way, and that he would wait for his lawyer before making a statement. The Appellant testified at the suppression hearing that he told Sergeant Sims, "I said I want my lawyer." According to the Appellant, Sergeant Sims responded, "you don't get a lawyer right now" and continued the questioning. The Appellant testified that during this exchange only he and Sergeant Sims were present. Following the interview, the Appellant gave a statement admitting to the shooting of the victim, which was then reduced to writing and signed by the Appellant.

No factual findings were made by the trial court regarding the Appellant's assertions at the suppression hearing that he had requested counsel or the request being denied by Sergeant Sims.

Although the trial court did enter findings with regard to the Appellant's relinquishment of his rights under the Fifth Amendment, there is a difference between the Fifth Amendment right to counsel and the Sixth Amendment right to counsel. The right to counsel provided by *Miranda* under the Fifth Amendment protects against coercion relative to self-incrimination, thus assuring voluntariness, while the right under the Sixth Amendment guarantees the right to legal assistance at any critical confrontation with state officials, irrespective of coercion. In the Sixth Amendment protections, if adversarial proceedings have begun, the accused may not be subjected to further interrogation by government authorities until counsel has been made available to him, unless the accused himself initiates further communication. *See Michigan v. Jackson*, 475 U.S. 625, 636, 106 S. Ct. 1404, 1411 (1986). Thus, the initial determination is whether adversarial proceedings have been initiated invoking the Sixth Amendment right to counsel.

The Sixth Amendment guarantees the accused, after the initiation of formal charges, the right to rely on counsel as a medium between himself and the State. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 487 (1985). Unlike the Fifth Amendment, under the Sixth Amendment, the accused need not make an unequivocal request for counsel to invoke the right. *See Jackson*, 475 U.S. at 633, 106 S. Ct. at 1409. A presumption exists that the accused requests the services of counsel at every critical state of the prosecution. *Id*.

When a defendant challenges the admissibility of a confession based upon the State's infringement of his Sixth Amendment right, the State bears the burden of showing that the appellant made a knowing and voluntary waiver of his right to counsel; *see Brewer v. Williams*, 430 U.S. 387, 404, 97 S. Ct. 1232, 1242 (1977), and any doubts must be resolved in favor of protecting the constitutional claim. *Jackson*, 475 U.S. at 633, 106 S. Ct. at 1409. In this regard, although not determinative as to whether a knowing waiver was provided, a specific request for counsel is considered "an extremely important fact in considering the validity of a subsequent waiver in response to police-initiated interrogation." *See Id*. at n.6.

Resolution of the issue of whether the Appellant invoked his right to counsel is factually driven. At the suppression hearing, the trial court made no findings with regard to the Appellant's Sixth Amendment rights. This court does not possess fact-finding authority. Our jurisdiction is appellate only. T.C.A. § 16-5-108 (2003). Thus, in this case in order to resolve the issue, we would be forced to act as the fact-finder, assess the credibility of the witnesses, and weigh the evidence, which clearly we are not permitted to do. This court reviews the application of the law to the facts *de novo*. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). If the findings are incomplete and/or the record is insufficient, *de novo* review cannot be performed if the issue presented is factually controlled. *See Ornelas v. United States*, 517 U.S. 690, 700, 116 S. Ct. 1657, 1664 (1996) (Scalia, J. dissenting). *De novo* review is permitted to prevent a miscarriage of justice resulting from the *legal* determination of a single judge, not to reconstruct the factual determinations of the trial court. Thus, if the trial court fails to perform its fact-finding obligations, as required by Tennessee Rule of Criminal Procedure 12(e), an appellate court is prevented from completing any meaningful review of the law in the absence of any facts. As such, it is necessary that this case be remanded to the trial court for a determination of whether the Appellant's Sixth Amendment right to counsel was violated.

Upon remand, if the trial court finds that the Appellant's August 4th statement was lawfully obtained, the court shall recite its findings and enter an order accordingly and reinstate the judgment of conviction. Should the trial court find that the statement was illegally obtained, the State argues on appeal that its admission at trial during the State's proof constituted harmless error. This assertion is based upon the fact that the Appellant's statement to Sergeant Sims and his testimony at trial were essentially the same, *i.e.*, that the homicide was accidental. Accordingly, the State argues under these facts, suppression of the statement and the granting of a new trial are unnecessary.

In view of the U.S. Supreme Court's decision in *Harrison v. United States*, 392 U.S. 219, 88 S. Ct. 2008 (1968), we disagree with the State's argument of "harmless-error review." *See also State v. Valentine*, 911 S.W.2d 328 (Tenn. 1995) (denying plain error analysis under a *Harrison* review). In *Harrison*, the Supreme Court concluded that a determination is first required to resolve the question of whether the State's use of an illegally obtained statement induced the defendant to take the stand in order to overcome the impact of the statement. This determination has been described as a two-part inquiry.

> First, the [reviewing] court must consider whether the defendant testified "in order to overcome the impact of [statements] illegally obtained and hence improperly introduced[.] *Harrison*, 392 U.S. at 223, 88 S. Ct. 2008. Second even if the court concludes that the defendant would have taken the stand, it must determine whether the defendant would have repeated the damaging testimonial admissions "if the prosecutor had not already spread the petitioner's confessions before the jury." *Id.* at 225-26, 88 S. Ct. 2008.

*Wisconsin v. Anson*, 698 N.W.2d 776, 784 (Wis. 2005).

Because the error is constitutional in nature, the State bears the burden of proving beyond a reasonable doubt that the Appellant was not impelled to testify due to the introduction of his illegally-obtained statement. *Harrison*, 392 U.S. at 225, 88 S. Ct. at 2011. Thus, in this case, should the trial court conclude, following a *Harrison* hearing, that although the statement was illegally obtained, its admission was harmless beyond a reasonable doubt, the trial court shall enter its order accordingly and reinstate the judgment of conviction. Should the court find that the statement was unlawful and its admission was not harmless beyond a reasonable doubt, the trial court shall suppress the statement and grant a new trial. If the State, the Appellant, or both, disagree with the finding of the trial court on this issue, either or both may appeal.

**CONCLUSION**

We conclude that the evidence is legally sufficient to support the Appellant's conviction for first degree murder. Moreover, we conclude that the proof does not preponderate against the trial court's finding that the Appellant's statement was not involuntary. However, because the trial court failed to make any findings with regard to factual disputes involving the Appellant's Sixth Amendment right to counsel, remand for a hearing on this issue is required. Accordingly, the judgment of conviction is vacated, and the case is remanded for a suppression hearing consistent with the instructions set forth in this opinion.

_____
DAVID G. HAYES, JUDGE