IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2001

## STATE OF TENNESSEE v. DARRIN BRYANT

**Appeal from the Criminal Court for Shelby County**
**No. 98-03828     Carolyn Wade Blackett, Judge**

———————————

**No. W2000-01136-CCA-R3-CD  - Filed July 11, 2001**

———————————

After a jury trial, Defendant, Darrin Bryant, was convicted of attempted first degree murder. Subsequently, he was sentenced to twenty-five (25) years, Range I, Standard Offender in the Department of Corrections.  In this appeal as of right, Defendant asserts that the trial court erred in sentencing Defendant to the maximum sentence of twenty-five (25) years by inappropriately applying an enhancement factor; and the State failed to present sufficient evidence to justify a rational trier of fact in finding beyond a reasonable doubt, that the assault was an attempt to commit premeditated murder.  We conclude that the evidence was sufficient to support the conviction and that the trial court did not err in sentencing Defendant to the maximum of twenty-five (25) years in the Department of Corrections.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

L. TERRY LAFFERTY, SR. J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. DAVID H. WELLES, J., not participating.

A. C. Wharton and Tony N. Brayton, Memphis, Tennessee, for the appellant, Darrin Bryant.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; and Betsy Carnesale, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At trial, Ms. Carol McKinnon, age 35, mother of two sons, Deshun, age 14, and Javon, age 11, testified that she, her two sons and Defendant were living at 1973 Cloverdale, Memphis, Tennessee, on November 25, 1997.  She and Defendant had been living together since June of 1997. She testified that on the Sunday before the 25th, Defendant began acting strangely:

"Just kind of saying, like, we were laying across the bed watching TV and he kind of grabbed me real hard around my throat, but he said that he didn't mean any harm,

that he was just playing with me. And he started saying that he didn't want to live without me. And just a lot of stuff about my ex-boyfriend and stuff like that. And it kind of scared me so I called one of my girlfriends to come over to stay with me, like the rest of the day, because it kind of made me nervous, because it was just me and Darrin at home."

Later, her girlfriend came over and stayed all day with her. On Monday, the following day, Defendant called her at work a number of times stating he loved her. When she arrived home between 4:40 and 4:45 p.m., Defendant was cooking and her sons were either in the living room doing their homework or getting their clothes together for school. Defendant had drawn her bath water and laid out her gown. After they had eaten, the boys were in the living room watching television, she had her bath and got into bed. Defendant gave her a massage because she told him her back was hurting. Ms. McKinnon stated she fell asleep about 10:00 p.m. and was awakened by Defendant who was moving around in the bedroom. He advised her that the boys were asleep in the living room and he was going to check the doors to make sure they were locked. Defendant stepped out of the bedroom and when he returned he shut the bedroom door, which made Ms. McKinnon curious. She asked him about the door and noticed he was standing on her side of the bed when he answered. "And that's when everything just started happening."

Defendant jumped in the bed on her chest and she asked him, "What was going on?" He stated that "he wasn't going to live without me. All he wanted was a chance to make me happy. And that he loved me." Ms. McKinnon stated that she was trying to yell and he was covering her mouth with his hand. Then he put his hand on her throat and started choking her, telling her to be quiet. She stated that during the scuffle, her head was pulled back and she could see the knife in his hand and thought he was going to cut her throat. She described the knife as one of her steak knives. Ms. McKinnon asked Defendant not to kill her and he told her that "he was going to kill me and he was going to kill himself. And I was crying and asking him not to." The victim turned her head and the knife went into her face (cheek). The victim stated she was stabbed about eight times and required 80 stitches to repair the stab wounds. The victim was able to run into the living room where her sons were sleeping. She fell on the couch and her sons laid on top of her as Defendant continued to threaten to kill her. The knife Defendant was using broke off in the back of her arm, so Defendant obtained two more knives from the kitchen. She stated her sons kept asking Defendant to leave, then Defendant looked at her, realized what he had done and said he would have to go to jail, and he started telling the kids he was sorry and to call an ambulance and the police. Finally, the kids were able to call the police.

Ms. McKinnon testified that she had talked to Defendant on several occasions since the incident. He would say he was sorry and apologize. During one of the conversations, he had told her that on Sunday while they were laying across the bed and he was choking her, he could have killed her then.

During cross-examination, Ms. McKinnon identified some letters and cards that she had sent to Defendant while he was incarcerated. The victim acknowledged that she stated she still loved the

Defendant and signed one of the letters with a lipstick kiss and another letter as Carol Bryant. Also, the victim sent Defendant photos of her which had been taken at Defendant's sister's home.

Javon McKinnon, age 12, a 6th grade student, testified that he, his brother, Dashun, his mother and Defendant lived at 1973 Cloverdale, Memphis, Tennessee, in November of 1997. Javon was asleep on the living room floor on November 24th or 25th when he heard some "bumping and jumping." He heard his mother yell, "Darrin's got a knife." His mother ran into the living room and jumped on the couch. Javon and his brother got on top of their mother. He saw she was bleeding from the arm. Darrin had a knife in his hand and he said "he was going to kill her and kill himself." Javon continued to lay on top of his mother so Defendant would not stab her. Javon told Defendant that "they would tell the police that somebody broke in." At Javon's request, Defendant got the phone, which Javon plugged into the wall and called 911. Defendant left and Javon told the 911 operator that his mother's boyfriend had tried to kill her.

Dashun McKinnon, age 14, an 8th grade student, testified that he lived with his mother, Defendant, and his brother, Javon, at 1973 Cloverdale, Memphis, Tennessee. Dashun stated he heard his mother calling their names and she came running into the living room and jumped on the couch. Dashun saw Defendant go into the kitchen and get two knives. Defendant told the boys to get off their mother so he could kill her. They said "no" and continued to stay on top of their mother to protect her. Dashun saw a knife blade sticking in his mother's arm. Defendant gave Javon a phone and Javon called 911. Defendant got his coat and the victim's car keys and drove off.

Alvin Moore of the Memphis Police Department, South Precinct, testified that he received an "armed party" call on November 25, 1997, at 12:32 a.m., to 1973 Cloverdale. He was met by two young hysterical boys who said their mother had been stabbed. Officer Moore observed quite a bit of blood in the living room. The boys told him that their mother's boyfriend had stabbed her. About thirty-five (35) or forty-five (45) minutes after Officer Moore arrived at the residence, Defendant called on the phone and spoke to the officer. Officer Moore identified himself and Defendant asked, "Is she dead?" Officer Moore replied "no." Officer Moore attempted to get Defendant to return to the house, but Defendant refused to do so. Officer Moore then asked Defendant where he was and Defendant replied, "I'm not going to tell you that either. I'm going to kill myself." Officer Moore then put out a broadcast of the victim's car which had been driven away by Defendant.

Sheila Wright of the Memphis Police Department, testified that she was riding with Officer Moore when they got a disturbance call to 1973 Cloverdale. She observed the victim inside the house with several stab wounds and blood was everywhere. Officer Wright identified a photo of a knife.

Defendant offered no proof on his behalf.

# LEGAL ANALYSIS

## SUFFICIENCY OF EVIDENCE

In his second assignment of error, Defendant asserts that the evidence is insufficient to justify a finding of guilt beyond a reasonable doubt of attempted murder first degree. The State counters that the record supports that the element of premeditation was proven beyond a reasonable doubt.

Rule 13(e), Tennessee Rules of Appellate Procedure, prescribes that "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *State v. Smith,* 24 S.W.3d 274, 278 (Tenn. 2000). Also, a conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal bears the burden of showing that the evidence was insufficient. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173, 176 (Tenn. 1963); *State v. Buggs,* 995 S.W.2d 102, 105-06 (Tenn. 1999).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982); *State v. Smith,* 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. *State v. Buggs,* 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. *State v. Tuggle,* 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *State v. Morris,* 24 S.W.3d 788, 795 (Tenn. 2000); *State v. Pappas,* 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

First degree murder is: "(1) A premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202. Tennessee Code Annotated § 39-12-101, Criminal attempt is defined:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Defendant argues that the State failed to prove beyond a reasonable doubt that the attempted homicide was premeditated in that the intent to kill must be established after a period of reflection and judgment. Tennessee Code Annotated § 39-13-202(d) defines premeditation as:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question for the jury which may be established by proof of circumstances surrounding the killing. *State v. Suttles,* 30 S.W.3d 252, 261 (Tenn. 2000), citing *State v. Bland,* 958 S.W.2d 651, 660 (Tenn. 1997). There are several factors which tend to support the existence of this element which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *Id.* Looking at the evidence in the light most favorable to the State, on Sunday before the actual attack, Defendant seemed concerned about the victim's former boyfriend. He attempted to choke her while she was lying across the bed and later admitted that he had the opportunity to kill her that Sunday. The victim was in enough fear that she felt it necessary to call a friend to spend the day with her. On the following Monday, Defendant constantly called the victim assuring her of his love and their need to talk. Then, there was the graphic description by the victim of the actual stabbing of her by Defendant to the extent that a knife blade was broken off and left in her arm. As testified by the victim's son, Dashun, Defendant went into the kitchen and obtained two more knives, and then made repeated statements that he would kill her and then kill himself. We conclude that there was ample evidence for the jury to find premeditation based upon reflection and judgment to constitute a charge of attempted murder first degree. There is no merit to this issue.

## SENTENCING

Defendant complains that the trial court erred in sentencing him to the maximum of twenty-five (25) years by inappropriately applying an enhancement factor. The State asserts that the trial

-5-

court's application of enhancement factor (10) was appropriate under the facts of this case. Also, if any error was made by the trial court, it was its failure to apply enhancement factors (4) and (5).

At the conclusion of a sentencing hearing, the trial court imposed the maximum Range I sentence of twenty-five (25) years for attempted murder first degree, a Class A felony. The sentencing range for attempted murder first degree is from fifteen (15) to twenty-five (25) years. The presumptive sentence for a Class A felony shall be the midpoint of the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). Should there be enhancement but no mitigating factors for a Class A felony, then the court shall set the sentence at or above the midpoint range. Should there be mitigating but no enhancement factors for a Class A felony, then the court shall set the sentence at or below the midpoint range. Tenn. Code Ann. § 40-35-210(d) (Supp. 2000).

When an accused challenges the length, range or manner of service of a sentence, this court has a duty to conduct a *de novo* review of the sentence with the presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). In determining a proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any statutory mitigating or enhancement factors; (6) any statement that the defendant made on his own behalf; and (7) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; *State v. Adams,* 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997).

The trial court found as enhancement factors the following as set forth in Tennessee Code Annotated § 40-35-114:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. This factor is clearly established in the record. The defendant was convicted of aggravated robbery and received a 9 year sentence in 1994. The defendant has two misdemeanor convictions for assault, two convictions for weapons offenses and numerous traffic convictions. Likewise, the pre-sentence report reveals the defendant had a probation violation in 1993.

(13) The felony was committed while the defendant was on release status: to wit, parole, for the conviction of aggravated robbery. This factor clearly applies. The defendant admitted in his testimony that at the time of this offense he was on parole.

(10) The defendant had no hesitation about committing a crime when the risk to human life was high. The trial court explained that this factor applied because two

young children that were there as well as the fact that even though the victim lived, I think that this could have been a much more tragic situation as to the three people that were involved that night.

The trial court rejected the State's contention that it should apply the enhancement factors, whether or not Defendant was a leader, whether the victim of the offense was particularly vulnerable, and whether or not Defendant treated or allowed the victim to be treated with exceptional cruelty. Further, as to mitigating factors, the trial court found none applied. Specifically, the trial court rejected Defendant's testimony about seeing his mother killed before his eyes as a young child, as well as Defendant's depression and his giving the phone to the son to seek assistance.

Determining whether an enhancement factor should be applied is a task that must be undertaken on a case by case basis. A trial court may not apply an enhancement factor if it is an essential element of the offense charged in the indictment. Tenn. Code Ann. § 40-35-114. The test for determining whether an enhancement factor is an essential element of an offense is whether the same proof necessary to establish a particular element would also establish the enhancement factor. *State v. Jones,* 883 S.W.2d 597, 601 (Tenn. 1994). In *Jones,* our Supreme Court held that the focus in determining the applicability of enhancement factors should be on whether the "risk to human life was high." *Id.* at 602. Little, if any, emphasis is to be placed on whether Defendant "hesitated before committing the crime." *Id.* Therefore, following the *Jones* rationale, if the proof necessary to establish an element of the offense would establish that the "risk to human life was high" the enhancement factor is an essential element of the offense and, thus, not applicable. In the case of attempted murder first degree, a high risk to human life will obviously exist. Thus, we conclude that enhancement factor (10) constitutes an essential element of the instant offense and would be improperly applied by a trial court. However, in this case the State argues that the facts support the application of enhancement factor (10). The State asserts that Defendant's following the victim into the living room, after the repeated stabbing, obtaining two knives and continued threatening of the mother by asking the boys to move so he could kill the victim constituted a "high risk to human life." We must respectfully disagree with the State's theory. These actions more than support the element of premeditation, the essential element of murder first degree. The only distinction between attempted murder first degree and murder first degree is the victim died. We find the application of enhancement factor (10) was an error, but at most, a harmless error.

We are, however, in agreement with the State that enhancement factor (5), the Defendant treated the victim with exceptional cruelty during the commission of this offense, is applicable. Defendant, while the victim is asleep, obtains a steak knife. He comes in the bedroom, shuts the door, grabs the victim by the head as if to cut her throat and repeatedly stabs her up to eight times. One of the blows is sufficient to break off the blade of the knife in the victim's arm. The victim is hospitalized for up to 18 hours and 80 stitches are required to repair the stab wounds. Defendant's actions are compounded by the fact that the victim runs into the living room, jumps on the couch and it is necessary for her two minor sons to lie on top of her to protect her from additional stabs. The sons see Defendant obtain two knives from the kitchen and threaten to kill their mother before their eyes. Fortunately, Defendant regains his senses and leaves before any further damage is done. *See*

*State v. Alexander,* 957 S.W.2d 1, 6 (Tenn. Crim. App. 1997) (in sentencing for attempted murder first degree, Defendant stabbed victim in face and body several times and beat victim with hammer to justify application of enhancement factor (5)).

In conclusion, we agree that enhancement factors (1), (5) and (13) are applicable to increase Defendant's sentence from the midpoint of twenty (20) years to twenty-five (25) years, Range I. As the trial court found, we agree that there are no mitigating factors.

The trial court's judgment is affirmed.

_____
L. TERRY LAFFERTY, SENIOR JUDGE