# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 12, 2002

## STATE OF TENNESSEE v. JOEL WAYNE JACKSON AND JOEL KEITH RUSSELL

### Direct Appeal from the Circuit Court for Hardin County
### No. 7966    C. Creed McGinley, Judge

---

### Nos. W2001-00587-CCA-R3-CD and W2001-00570-CCA-R3-CD
### Filed July 26, 2002

---

The appellants, Joel Wayne Jackson and Joel Keith Russell, were each convicted in the Hardin County Circuit Court of one count of possessing more than .5 grams of cocaine with intent to sell. They were each sentenced to eight years incarceration in the Tennessee Department of Correction with the sentences to be served on supervised probation after serving ninety days in confinement. On appeal, Jackson challenges the correctness of his sentence and Russell contests the sufficiency of the evidence supporting his conviction. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Chadwick G. Hunt, Savannah, Tennessee, for the appellant, Joel Wayne Jackson.

Mike Mosier, Jackson, Tennessee, for the appellant, Joel Keith Russell.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Robert "Gus" Radford, District Attorney General; and John W. Overton, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

On March 31, 2000, members of the 24th Judicial District Drug Task Force, specifically Officers Tim Cunningham and Mark Anderson, executed a search warrant on a residence

and an adjacent outbuilding owned by Jackson. The officers had previously bought crack cocaine from Jackson, using marked ten-dollar bills to make the purchase. The marked bills were a specific target of the search.

As the officers approached the residence, they saw several individuals standing near the outbuilding. Upon seeing the officers driving toward the residence, Jackson ran.[1] Officer Cunningham chased Jackson with Officer Anderson in close pursuit. Jackson fled into the outbuilding, which building contained a "game room" with a coin-operated pool table and several video game machines. Officer Cunningham followed Jackson upstairs into the game room where he encountered Russell and Russell's wife, Nancy. Jackson continued through the game room and down a set of stairs where he was finally apprehended by a state trooper.

Pursuant to a search of Jackson, Officer Cunningham discovered $323, including two of the marked ten-dollar bills which had been used to make the previous drug purchase from Jackson. After Officer Cunningham placed Jackson into a police vehicle, the officer was informed by Officer Anderson that Russell was in possession of a large amount of money. Officer Cunningham returned to the game room and, after examining $1,080 discovered in Russell's possession, he found one of the marked ten-dollar bills. Officer Anderson also discovered a Tylenol bottle containing crack cocaine lying just outside a pocket on top of the nearby pool table. Officer Cunningham testified that the officers also discovered a "crack pipe" in the downstairs portion of the garage. He further explained that, upon his initial entry into the game room, Russell and Nancy were shooting pool and were the only people in the room besides Jackson. Moreover, Officer Cunningham asserted that Russell's presence at the residence was a surprise as Russell was not involved in the earlier controlled drug purchase and he had no ownership interest in the property.

At trial, Officer Anderson testified that, when he entered the game room behind Officer Cunningham, Russell and Nancy did not appear to be playing pool. However, Officer Anderson remarked that they both appeared to be "very nervous." He further observed that the amount of crack cocaine discovered in the Tylenol bottle could be smoked within a few minutes. He explained that the bottle was found on the side of the pool table opposite where Russell was standing.

Agent Brian Eaton, a forensic scientist with the Tennessee Bureau of Investigation (TBI) crime laboratory, testified that the substance found in the Tylenol bottle was .5 grams of cocaine base, otherwise known as crack cocaine. He explained that the margin of error regarding the weight of the substance discovered was .02 grams; in other words, the weight of the substance could be .48 grams or .52 grams of crack cocaine.

---

[1] The officers were driving both unmarked vehicles and state trooper vehicles.

Explaining why he ran from the police, Jackson testified at trial that "I just took off running because I didn't know who it was, and when the vehicles was coming down the road, it was already guns hanging out the window." He asserted that the game room was open to the public and "[a]ll day that day, everybody had been in there." He explained that the downstairs area of the outbuilding was the living quarters of his brother-in-law Tommy Byrd and Byrd also had access to the game room. Jackson contended that he had no knowledge of or information about the crack pipe that was discovered. He also denied giving the Tylenol bottle to Russell. Jackson further denied that he smoked crack cocaine. He claimed that the money discovered in his pocket was "money I work for." He maintained that he was self-employed in a lawn care business. He also claimed that his possession of two marked ten-dollar bills was "just a coincidence." He acknowledged that Russell was an infrequent visitor to the premises, visiting approximately five times a year.

Russell testified at trial that he and his wife, Nancy, went to Jackson's residence in order to purchase crack cocaine for their personal use. Upon arriving at the residence, the Russells bought a $50 "rock" of crack cocaine from the appellant and smoked it. Russell maintained that Jackson took the crack cocaine from a Tylenol bottle which contained three additional rocks of crack cocaine. Following the sale, Jackson put the bottle back into his pants pocket. Russell stated that, on the afternoon of the search, he saw Jackson in the game room at two different times. He explained that the last time Jackson came in the game room, Jackson told the Russells that the police were on their way. Russell stated that Jackson removed a large amount of money from his billfold and gave it to Russell, concluding that if Russell did not have "anything on [him]," the police could not take the money from him. Russell also maintained that he did not know who put the Tylenol bottle on the pool table, but acknowledged that he and his wife had shot one game of pool on the table during their 35 to 45 minute stay at the residence. He indicated that the Tylenol bottle appeared to be the same one he had seen in Jackson's possession earlier in the day.

Russell's wife, Nancy, testified at trial that she and her husband were on the premises to purchase crack cocaine from Jackson. She stated that they were at the location for 40 or 45 minutes prior to the arrival of the police. Earlier that day, she saw Jackson in the kitchen of his residence in possession of the Tylenol bottle which contained crack cocaine. The Russells bought $50 dollars' worth of the crack cocaine and smoked it while they were there. Later, Jackson gave them another $50 rock from the Tylenol bottle, but did not make them pay for it. The Russells smoked this rock as well. Nancy maintained that she and her husband were in the game room when Jackson ran into the room shouting, "[t]he feds are here." She asserted that Jackson gave Russell a large amount of money and stated that the police could not take the money from Russell. Nancy alleged that she saw the Tylenol bottle in Jackson's hand in the game room, but she did not see what he did with the bottle. She indicated that neither of the Russells owned a Tylenol bottle like the one the police discovered. She stated that she and her husband never touched the Tylenol bottle and noted that other people had been in the game room that day.

A jury in the Hardin County Circuit Court convicted both Jackson and Russell of one count of possession of .5 grams of cocaine with intent to sell.[2]  The trial court sentenced the appellants to eight years incarceration, suspending the sentence after service of ninety days in confinement.  On appeal, Jackson contests his sentence to confinement and Russell contests the validity of his conviction.  We will begin by analyzing the sufficiency of the evidence supporting Russell's conviction.

## II.  Analysis

This court grants considerable weight to the verdict of a jury in a criminal trial when analyzing an appellant's challenge to the sufficiency of the evidence supporting his conviction.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  This is because "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact."  State v. Manning, 909 S.W.2d 11, 13 (Tenn. Crim. App. 1995).  Accordingly, a jury conviction essentially removes the presumption of the appellant's innocence and replaces it with a presumption of guilt.  State v. Suttles, 30 S.W.3d 252, 260 (Tenn.), cert. denied, 531 U.S. 967, 121 S. Ct. 401 (2000).  Moreover, as the prevailing party in the trial court the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  State v. Cottrell, 868 S.W.2d 673, 675 (Tenn. Crim. App. 1992).  Therefore, Russell bears the burden of demonstrating to this court why the evidence will not support the jury's findings.  Id.  In order to meet this burden, Russell must establish that no reasonable trier of fact could have found the essential elements of the offense in question beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

To obtain Russell's conviction, the State was required to prove that Russell knowingly possessed the cocaine in the Tylenol bottle with the intent to sell that cocaine.  Tenn. Code Ann. § 39-17-417(a)(4) (1997).  Possession of a drug can be either actual or constructive.  State v. Transou, 928 S.W.2d 949, 955 (Tenn. Crim. App. 1996).  As this court explained in State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (citations omitted):

> Before a person can be found to constructively possess a drug, it must appear that the person has "the power and intention at a given time to exercise dominion and control over. . . [the drugs] either directly or through others."  In other words, "constructive possession is the ability to reduce an object to actual possession."  The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs.  Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs.

Furthermore, "if the amount involved is point five (.5) grams or more of any substance containing cocaine," the offense is a class B felony.  Tenn. Code Ann. § 39-17-417(c).  "The amount of cocaine

---

[2]  Nancy Russell was also charged on the named offense; however, the trial court entered a judgment of acquittal in her favor.

sold by the defendant is an essential element of the Class B felony of selling cocaine [or possessing cocaine with the intent to sell]." State v. Walker, 29 S.W.3d 885, 893 (Tenn. Crim. App. 1999).

The police found Russell in the same room where the Tylenol bottle containing crack cocaine was discovered. Russell admitted that, earlier that day, he had been playing pool on the pool table where the bottle was found. Moreover, Officer Cunningham testified that, when he entered the game room, Russell was standing near the pool table. Upon searching Russell, the police discovered a large amount of money, including a ten-dollar bill which had been marked in an earlier drug purchase from Jackson. In sum, the evidence against Russell consisted of his presence in the area where the crack cocaine was found, the large amount of money discovered on his person, and the presence of a marked bill among the money found on Russell. Again, we recognize that Russell's "mere presence in [Jackson's game room] is not, standing alone, sufficient to support a conviction for [this] offense[]." Transou, 928 S.W.2d at 956. Nor may Russell's "mere association" with Jackson be sufficient to support his conviction. Id. However, there was more evidence against Russell than his mere presence at the location. He was at the location with full knowledge of the existence of the crack cocaine in the Tylenol bottle. The police discovered a large amount of money on his person, including a marked ten-dollar bill which had been used in a recent controlled drug buy. Russell and his wife testified that the money was in Russell's possession only because of Jackson's belief that "[t]hey can't take it off of you [if] you haven't got anything on you." The jury heard this testimony and, obviously, discounted it. We will not here reevaluate the credibility of the witnesses. Although not overwhelming, we conclude that after examining the evidence in the light most favorable to the State the evidence is sufficient to support Russell's conviction for possessing the cocaine with the intent to sell.

> As a tangential issue, Russell contends that
> [t]he expert testimony established that the amount of the crack cocaine was either .480 grams or .520 grams. The Defendant submits that this fact, which is entirely within the province of an expert, is per se reasonable doubt, insofar as the quantity of the substance is concerned, and further illustrates that the jury was arbitrary in this case.

However, Russell fails to cite any authority in support of this contention, arguably waiving the issue. Additionally, Russell failed to object to the testimony at trial, making the issue one for the jury. See Walker, 29 S.W.3d at 893; State v. Leon Goins, No. W1999-00157-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 355, at *6 (Jackson, May 2, 2000); cf. State v. Danny Munson, No. W2001-00157-CCA-R9-CD, 2001 Tenn. Crim. App. LEXIS 968, at *9 (Jackson, December 31, 2001); State v. Mark T. Scisney, No. 01C01-9605-CC-00209, 1997 Tenn. Crim. App. LEXIS 1040, at *20 (Nashville, October 16, 1997). The jury determined the evidence established that the amount of crack cocaine in the bottle was .5 grams or more. See Goins, No. W1999-00157-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 355, at **11-12; State v. Randy Joy, No. 02C01-9705-CC-00183, 1997 Tenn. Crim. App. LEXIS 1178, at *4 (Jackson, November 25, 1997).

B. Sentencing

On appeal, Jackson contends that the "the trial court erred in sentencing [him] to ninety (90) days confinement rather than suspending any period of incarceration." This court reviews challenges to the manner of service of a sentence de novo. Tenn. Code Ann. § 40-35-401(d) (1997). Moreover, because the record reflects that the trial court properly considered the sentencing principles and the facts and circumstances surrounding the offense, we will accord the trial court's findings a presumption of correctness. Id.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Regardless, Jackson bears the burden of demonstrating to this court why the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

This court will consider the following factors in conducting its de novo review: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by Jackson in his own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102 and -103 (1997), -210 (Supp. 2001); see also Ashby, 823 S.W.2d at 168.

> In making its sentencing determination, the trial court observed that: there are innuendos of substantial drug involvement on Mr. Jackson, but I'm going to give him the benefit of the doubt in this case, as I will both Defendants in this case.
>
> I'm basically considering the fact that they have no prior record. . . . [Accordingly,] I'm going to sentence both of these Defendants to the minimum of eight years.
> . . . .
> They have been convicted of a Class B felony, which means they do not enjoy that presumption of eligibility for alternative sentencing . . . . However, there is no substantial record as to each of these Defendants.
>
> . . . Mr. Jackson indicates he hasn't used [drugs], I think, in seven years, but, nevertheless, there's his involvement in this particular case as far as the dealing type of situation.
>
> In considering this case as a whole, I do not feel that they are appropriate for total probation. . . . I think that some period of incarceration is necessary to avoid depreciating the seriousness of this offense. . .

Because Jackson was convicted of a class B felony, he is not entitled to the statutory presumption in favor of alternative sentencing. Tenn. Code Ann. §40-35-102(6). However, because he received an eight-year sentence, the minimum within the range for a Class B felony, he may still

be considered for alternative sentencing. Tenn. Code Ann. § 40-35-303(a) (1997). However, "[h]ad the Defendant not received the minimum sentence in the range [for a B felony], [he] would not have even been eligible for probation." State v. Kathleen Malley, No. W2000-01064-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 526, at *10 (Jackson, July 16, 2001). Regardless, the trial court did grant Jackson the alternative sentence of split confinement. Jackson argues that he should have received full probation.

"The determination of whether the appellant is entitled to an alternative sentence and whether the appellant is entitled to full probation are different inquiries." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Because Jackson seeks full probation, he bears the burden of establishing his suitability for full probation, regardless of whether he is entitled to a statutory presumption of alternative sentencing. Id.; see also Tenn. Code Ann. § 40-35-303(b). Accordingly, Jackson must establish that granting his full probation will "'subserve the ends of justice and the best interest of both the public and the [appellant].'" State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

> This court has explained that
> [i]n determining one's suitability for full probation, the court may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes.

Boggs, 932 S.W.2d at 477. While recognizing Jackson's limited criminal history, the trial court nonetheless determined that the seriousness of the offense warranted a denial of full probation. We conclude that the trial court did not err in denying Jackson full probation.

At the sentencing hearing, Jackson made no arguments in favor of the granting of full probation. Notably, counsel for Jackson specifically stated that

> [w]ith the exception of [some driving offenses], I think that Mr. Jackson certainly would qualify for some type of alternative sentence, whether it's split [confinement], or whatever the Court sees fit, and based on his prior record, that's what we're asking the Court to do today.

After a review of the record, we have gleaned that, for approximately four and a half years, Jackson was "self-employed; doing carpentry work, as well as yard work and cutting/selling wood." Additionally, aside from the driving offenses, Jackson has no history of criminal convictions. However, Jackson admitted in the presentence report that he used cocaine daily during a two-year period, but alleged that he quit using cocaine approximately seven years prior to the offense. We also find it important to note that at trial both Russell and Nancy testified that Jackson sold them cocaine on at least one occasion on the day of the offense. Moreover, Russell claimed that

he had bought drugs from Jackson on more than one occasion. Regardless of his lack of prior criminal convictions, we nonetheless conclude, in light of the foregoing facts, that Jackson failed to meet his burden of establishing his suitability for full probation. See State v. Adam Short, No. 03C01-9703-CC-00090, 1998 Tenn. Crim. App. LEXIS 130, at *7 (Knoxville, January 28, 1998).

## III. Conclusion

Based upon the forgoing, we affirm the judgments of the trial court.

 

NORMA McGEE OGLE, JUDGE