# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 14, 2002 Session

## STATE OF TENNESSEE v. DENNIS PYLANT

### Direct Appeal from the Circuit Court for Cheatham County
No. 13469     Allen W. Wallace, Judge

_____

### No. M2001-02335-CCA-R3-CD - Filed May 8, 2003

_____

The appellant, Dennis Pylant, was found guilty in the Cheatham County Circuit Court of felony murder committed in the perpetration of aggravated child abuse.[1]  The appellant received a sentence of life imprisonment in the Tennessee Department of Correction.  On appeal, the appellant raises several issues for our consideration, namely the sufficiency of the evidence, evidentiary issues, and a complaint regarding the jury instructions.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

James Robin McKinney, Jr., and John David Moore, Nashville, Tennessee, for the appellant, Dennis Pylant.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background
The appellant was charged by presentment by the Cheatham County Grand Jury with the felony murder of Stephen Joe Davis, III, a child less than three years old, during the perpetration of aggravated child abuse.  At trial, which began on April 23, 2001, the State first called the victim's father, Stephen Joe Davis, Jr.  Stephen Davis testified that the victim's birthday was September 25,

---

[1]  The  offense as listed in Tennessee Code Annotated section 39-13-202(a)(2) (1997) is first degree murder committed in the perpetration of any one of a list of enumerated felonies, including aggravated child abuse.

1996. Stephen and Amanda Davis also had a younger child named Jacob.[2] After a brief marriage, the two divorced. Subsequently, Amanda Davis moved to Cheatham County. At trial, Stephen Davis identified a picture of the two-year-old victim. Stephen Davis noted that Amanda Davis came to the funeral home to pay her respects to her son, but he did not see her at the burial. Stephen Davis did not know if the appellant attended either the funeral or the burial.

The next witness was George James Tucker, Jr. Tucker lived at 1024 Jane Circle in Cheatham County.[3] He testified that in September 1999, the appellant and Amanda Davis were his neighbors across the street. Shortly before 10:00 a.m. on September 24, 1999, Tucker was working in his garage with his father when Amanda Davis came "screaming" and "yelling" into his yard. Amanda Davis implored Tucker to call 911 because she could not awaken her baby. Tucker noted that Amanda Davis was "real hysterical." Tucker instructed his father to call 911 while he accompanied Amanda Davis to her home to check on the baby. When Tucker entered Amanda Davis' mobile home, he observed an infant in a car seat in the living room. He inquired as to whether that was the "baby" which concerned her. Amanda Davis replied in the negative, explaining that she could not awaken her toddler who was in the bedroom. Tucker entered the victim's bedroom and noted that "it had long passed because it had already set up – rigor mortis had set up in it, so I didn't even try to move it." He waited with Amanda Davis until the police and the paramedics arrived. Tucker agreed that the 911 record reflecting that the call for help came in at 9:52 a.m. would have been accurate.

Sean Greer of the Cheatham County Sheriff's Department was dispatched on September 24, 1999, to 1029 Jane Circle in Cheatham County. He arrived at the residence at 9:57 a.m., five minutes after he was dispatched. The paramedics arrived shortly after the officer. Officer Greer entered the residence and made contact with Amanda Davis and Tucker. Officer Greer noted that Amanda Davis "was weeping, but not irrational." Tucker directed Officer Greer to the bedroom where the victim was located. The officer and the paramedics entered the victim's bedroom. Officer Greer observed a toddler lying on his left side on a sleeping bag spread on top of the bed. The paramedics determined that the victim was dead and Officer Greer "established a crime scene." Officer Greer led the paramedics to the front of the residence and formed a blockade at the front door, effectively closing off half of the residence. Officer Greer requested that a detective from the Criminal Investigation Division (CID) be sent to investigate. In response, Sergeant Duncan arrived at the scene.

Sergeant Floyd Duncan, Jr., an investigator with the CID of the Cheatham County Sheriff's Department, was called to 1029 Jane Circle on September 24, 1999, to investigate the victim's death. Prior to Sergeant Duncan's arrival, other officers "contained" the scene. After his arrival at 10:37 a.m., Sergeant Duncan "started to process the internal scene." He observed that the

---

[2] Stephen Davis testified that he later discovered that he was not Jacob's biological father.

[3] Throughout the record, the address of the offense is referred to as "Jane Circle" or as "James Circle." For the sake of consistency, we have chosen to employ the former designation.

victim was lying on his left side as if he were asleep. The victim was "cold and rigid to the touch." There was no visible bleeding, but the victim had "sputum or vomit" with a vague reddish cast around his mouth. Sergeant Duncan opined that the victim had choked or vomited while in the reclining position. Sergeant Duncan took photographs of the crime scene, but those photographs were lost when they were sent to the Wal-Mart photographic laboratory for processing.[4]

Sergeant Duncan questioned Tucker about the events of that morning and was informed that a distraught Amanda Davis ran to Tucker's residence in order to call 911 for help for her unresponsive toddler. Sergeant Duncan spoke with Amanda Davis who "was in an obvious state of grief." Amanda Davis was not very coherent, but she was capable of answering some brief questions. Sergeant Duncan discovered that the victim suffered from low blood sugar and sometimes refused to eat. Therefore, initially Sergeant Duncan believed that there could be a medical reason for the victim's demise.

The victim's body was transported to the office of Dr. Charles Harlan for an autopsy. Subsequently, Dr. Harlan contacted Sergeant Duncan and informed him that the victim's death was a homicide. Accordingly, because there were other children in the home, Sergeant Duncan returned to the scene and informed the Department of Children's Services (DCS) of the suspicious death. Additionally, Sergeant Duncan transported the victim's body to Cheatham County Medical Center for x-rays. The x-rays did not reveal the existence of prior abuse.

On September 24, 1999, after receiving the call from Dr. Harlan indicating that the victim's death was a homicide, Sergeant Duncan requested interviews with the appellant and Amanda Davis. Sergeant Duncan administered <u>Miranda</u> warnings to the appellant and, at 11:30 p.m., the appellant signed a waiver of his rights. Sergeant Duncan asked the appellant about "whipping" the victim, and the appellant responded, "well, no, that's just not the way [we do] things." The appellant explained, "[N]obody whips the children in the home." Furthermore, the appellant insisted that Amanda Davis "[a]bsolutely" did not whip the children because she "doesn't believe in whipping them." Sergeant Duncan observed that prior to this interview, the appellant had been at the police station with his sister. On that occasion, the appellant had also insisted that no one in the home whipped the children.

During the 11:30 p.m. interview, the appellant stated that Amanda Davis resided with him as a live-in babysitter. The appellant's eight-year-old daughter, Rebecca Pylant, lived in the home as well as Amanda Davis' two sons. On September 23, 1999, the appellant came home early, at approximately 3:30 p.m. or 4:00 p.m., to care for the children while Amanda Davis went to the Department of Human Services (DHS) to obtain food stamps. The appellant related that Amanda Davis had been the only other adult with the children that day. The victim began crying upon learning that Amanda Davis was leaving and continued to cry after she left. Approximately thirty minutes after Amanda Davis' departure, the appellant changed the victim's "foul smelling" diaper;

---

[4] Sergeant Duncan noted that it was a common practice of law enforcement agencies to have their photographs processed at Wal-Mart.

yet, the victim continued to cry. The appellant asserted that he took the victim to the victim's room to attempt to interest him in playing with his toys. Sergeant Duncan noted that the appellant grumbled that he had thought, "[H]ere I am baby sitting the baby sitter's kids." The appellant also related that he heard the victim cry sometime between 8:00 p.m. and 9:00 p.m. on September 23, 1999.

Sergeant Duncan recalled that he briefly spoke with the appellant's daughter, Rebecca Pylant, on the night that he questioned the appellant. However, Rebecca was very tired during the conversation and the sergeant did not obtain much information from her. The appellant warned Sergeant Duncan to be careful in talking to Rebecca because she did not like Amanda Davis and "she's liable to say anything." Nevertheless, Sergeant Duncan opined that he would be able to discern Rebecca's truthfulness.

After the victim's death, Rebecca was sent to live with the appellant's sister, Sheila Wilson, but Sergeant Duncan "didn't think that was a good idea at all." Regardless, Sergeant Duncan acknowledged that the appellant was not allowed to call his daughter and that all of his visits with Rebecca were supervised by a DCS case worker.

Sergeant Duncan related that on September 30, 1999, while he was on vacation, Connie Adkinson with the Tennessee Bureau of Investigation (TBI) interviewed Rebecca. Moreover, Sergeant Duncan noted that he did not conduct any more interviews with the appellant because he would not talk and was difficult to locate. However, Sergeant Duncan interviewed Amanda Davis on several more occasions. He observed that both the appellant and Amanda Davis had been indicted by the Grand Jury, but he could not remember the nature of the charges against Amanda Davis.

After Sergeant Duncan's testimony, the trial was continued until the next day. Prior to the recommencement of trial on the morning of April 24, 2001, the State asked permission to recall Sergeant Duncan. The State proposed to have Sergeant Duncan explain that he was distracted during trial the previous day because he was teaching a class and had prepared for another trial that had been dismissed. Additionally, Sergeant Duncan would clarify the time frame regarding Amanda Davis' departure from the home on the day of the offense. The appellant objected to the recall of this witness. After a brief jury out hearing, the trial court allowed Sergeant Duncan to be recalled for the limited purpose of testifying regarding the time frame. On the stand, Sergeant Duncan related that the appellant told him that Amanda Davis left the home at approximately 4:00 p.m. and returned at 5:00 p.m. Additionally, Sergeant Duncan stated that the appellant informed him that the victim continued to cry while Amanda Davis was gone.

Next, the State called Dr. James Baldwin, the Cheatham County Medical Examiner. Dr. Baldwin testified that he took the x-rays of the victim's body. Dr. Baldwin related that the x-ray was a "negative survey," explaining that no new or old fractures were revealed.

Rebecca Pylant testified that she remembered the day that the victim did not awaken. She came home from school about 3:00 p.m. or 3:30 p.m. and did her homework by herself. The State asked Rebecca if she remembered giving a statement to Connie Adkinson and Susan Roberts. Rebecca answered in the negative. The appellant then objected to the State showing Rebecca her statement. The trial court overruled the appellant's objection. The State showed Rebecca her statement and asked her to read the first portion. After silently reading the first page of the statement, Rebecca acknowledged that she remembered talking with the two women. However, she did not specifically remember what she told the women about her activities when she got home from school. The State prompted Rebecca to read another portion of the statement. After she was finished reading, Rebecca stated that she remembered doing her homework with Amanda Davis' help. They did the homework at the kitchen table while the victim sat in the living room watching a movie.

Shortly thereafter, Amanda Davis left and the appellant "babysat" Rebecca and the victim; Rebecca did not remember if Jacob was there. The victim cried "a lot." Rebecca admitted that his crying was annoying, but she never got mad at the victim. However, the appellant became angry at the victim because of his crying. The victim cried while the appellant changed his diaper. Rebecca testified that the victim did not always cry when he was having his diaper changed. The State asked Rebecca to read another portion of her statement. Then the State asked if the victim cried when his diaper was getting changed and Rebecca responded in the affirmative. She acknowledged that the victim never "really" cried when Amanda Davis changed his diaper but "mostly" cried when the appellant changed him. Rebecca remembered saying that the victim "doesn't cry when Amanda does it, but he does when my daddy changes him."

The victim continued to cry after his diaper was changed. Rebecca was in the living room and the victim was in his bedroom. The appellant went into the victim's bedroom and Rebecca heard a noise. "It sounded like daddy spanking him." Rebecca heard the noise twice, and she went to the door of the victim's bedroom to investigate. While standing in the doorway, Rebecca observed the appellant holding the victim's arms up in the air with one hand while spanking the victim with the other hand. Rebecca saw the appellant strike the victim twice. Rebecca testified that the spanking was hard enough that she heard it from the living room. The victim was crying but not screaming. Rebecca noted that the appellant was mad while spanking the victim, but it was "[j]ust usual mad."

Rebecca testified that the victim then came out of his room and went into the living room. After questioning by the State, Rebecca stated that she did not remember saying in her statement that the victim never came out of his room again after the spanking. She acknowledged that the victim stopped crying at some point, but could not remember precisely when. She stated that the victim stayed in his room until Amanda Davis came home, but then he came out of his room. The State then instructed Rebecca to read a portion of her statement and asked if she remembered when the victim stopped crying. In response, Rebecca stated that he stopped crying before Amanda Davis came home. Rebecca further stated that there were no sounds coming out of the victim's room after Amanda Davis came home.

Rebecca testified that the victim had previously been spanked by both the appellant and Amanda Davis. Specifically, she maintained that someone other than the appellant also spanked the victim on the day in question. The State directed Rebecca to read the portion of her statement which indicated "that the only one who spanked [the victim] was daddy and you spelled it daddy." Subsequently, the following colloquy occurred:

State: Now did you remember telling Ms. Adkinson that he only got one spanking that day?
Rebecca: No.
State: Okay. Didn't you just read that?
Rebecca: Yes.
State: Okay. Doesn't it say that he only got one spanking that day?
Rebecca: Yes.
State: And didn't you say that daddy did the spanking?
Rebecca: Yes.

Rebecca acknowledged that she saw the appellant spanking the victim in the victim's bedroom. Upon noticing that Rebecca was watching the spanking, the appellant instructed Rebecca to go to her room. Rebecca did not know why she was sent to her room; she had not done anything wrong. She also did not see the victim do anything wrong.

Rebecca explained that Amanda Davis went into the victim's room later that night to put Jacob into the crib that was located in the same room. However, the victim never got up and Rebecca never saw the victim alive again.

On cross-examination, Rebecca revealed that the first thing she saw when she came home from school at 3:30 p.m. was Amanda Davis hitting the victim "hard" on his lower back four times with a wooden spoon. After the "beating," the victim stopped crying. However, he began crying again when Amanda Davis left "[b]ecause he didn't want his mom to leave." Upon further questioning, Rebecca clarified that she saw the appellant spank the victim with an open hand on his bottom, not on his back. The victim was wearing his diaper during the spanking. Rebecca noted that Amanda Davis checked on the victim when she got home but did not wake the victim for dinner.

Rebecca averred that the victim did not eat anything or have any juice that night. In a statement she gave on September 24, 1999, Rebecca stated that before Amanda Davis left, she was so angry at the victim because he would not eat that she "snatched him up by the arms and put him to bed." Rebecca admitted that in her September 30 statement, she did not mention Amanda Davis hitting the victim with a spoon. She acknowledged that she told Sergeant Duncan on October 15, 1999, about the spoon incident. Rebecca maintained that Amanda Davis never hit her with a spoon and never threatened to hit her. However, Rebecca stated that she had been spanked by the appellant. Rebecca agreed that she had testified at pretrial hearings about Amanda Davis hitting the victim with a spoon. At one hearing, she estimated that the beating lasted five or ten minutes.

Next, Randell Anderson, detective and chief captain,[5] testified that he interviewed the appellant on September 30, 1999, while Sergeant Duncan was on vacation. DCS worker Susan Roberts and TBI agent Connie Adkinson were also present. During the interview, the appellant became agitated when Adkinson began talking about Rebecca because he had been separated from his daughter. The women left the room and Captain Anderson asked the appellant about the victim. The appellant related that the victim had been to the doctor about a blood sugar problem and also stated that the victim would not eat. The appellant maintained that Amanda Davis did not "believe in" disciplining the victim and explained that "she'd make popping noises with her hand." Captain Anderson further explained, "He held his hand up and just said she would smack his bottom like that just to make popping noises. She would draw her hand back." The appellant informed Captain Anderson that Amanda Davis would not let him discipline the victim.

Susan Furlow, an employee of DHS, testified that Amanda Davis had an appointment with her at 4:00 p.m. on September 23, 1999. Amanda Davis arrived at the office at approximately 4:30 p.m. Furlow observed that at the time of the meeting, Amanda Davis was living at 1029 Jane Circle in Cheatham County, which address was located ten minutes away from the DHS office. The interview pertained to Amanda Davis' application for food stamps. Her demeanor was "fairly normal." Furlow talked with her about forty minutes and Amanda Davis left the DHS office at approximately 5:10 p.m.

Finally, the State called Dr. Charles Warren Harlan, an expert in forensic pathology. Dr. Harlan performed the autopsy on the victim and discovered "two lacerations of the gastric mesentery, 100% laceration disruption of the root of the mesentery, splanchnic vasoconstriction of the ileum; and hemoperitoneum of 520 cc. which is about one and a third pints of blood in the abdomen or belly." Dr. Harlan related that one and one thirds pints of blood is about half the amount of blood that would be found in a child the victim's age and size. In sum, the ultimate conclusion of the autopsy was that the victim bled to death.

Dr. Harlan explained that "[t]he injuries are to the back of the abdomen." The victim had red contusions on the back of the abdomen and had "yellow fluid coming from the nose and mouth." Specifically, Dr. Harlan related that

> in the abdomen we have multiple tears of the mesentery. The mesentery is a structure composed of fat and the fibrous connected tissue. The stuff that holds us together; and it contains arteries, veins and nerves.
>
> In this particular case, . . . there are two lacerations or tears of the mesentery supplying the blood supply to the stomach. The stomach is called the gastric, as the adjective form of it.

---

[5] The record does not indicate for which law enforcement agency Captain Anderson worked.

The mesentery then showed a 100% disruption or laceration of the root of the mesentery. That's – if you have a fan such as a fan that you would have used, perhaps, in church, that would fold open . . . , the bottom part of it where the fan arms come together would be called the root; and that is torn completely in two; and that is located just above the back bone in the middle of the body.

. . . .

There is also splanchnic vasoconstriction of the ileum which is the small intestine and that is caused by the loss of the blood supply of the arteries and veins to that area, to the small intestine; then there is bleeding from the torn arteries and veins located at the root of the mesentery.

Dr. Harlan also discovered one-third of a pint of brown mush with a chili-like smell in the stomach. He estimated that the death occurred two to twelve hours after the time of the injury and noted that the disruption in the victim's digestion provided clues as to the time of death. Relating to the reddish contusions on the back of the victim's abdomen, Dr. Harlan maintained that the injuries were caused by a cylindrical object such as a pin, a rod, a baseball bat, a lead pipe, the edge of a hand, or fingers. The injuries were caused by one to three blows to the body. Again, he stated that the cylindrical marks could have been caused by "the area of the palm or the little finger," explaining that "[t]he fingers are cylindrical objects and the edge of the palm is also a half cylinder." Dr. Harlan further related that three open hand blows to the back could cause the mesentery to tear. He stated that a wooden spoon could conceivably have caused the wounds if the spoon was applied with enough force, but Dr. Harlan expressed that the wounds were more consistent with a blow from a hand. However, three open hand blows to the buttocks would not cause the fatal injuries because that was the wrong area of the body. Dr. Harlan concluded his testimony by stating that rigor mortis would set in approximately six hours after death.

As defense proof, the appellant entered into evidence the presentment charging Amanda Davis with the felony murder of the victim. The appellant also entered into evidence Amanda Davis' plea of nolo contendere to child neglect, a Class D felony. Finally, the appellant entered the judgment of conviction against Amanda Davis reflecting that she received a four year sentence.

At the conclusion of the proof, the appellant requested that no lesser-included offenses be charged to the jury. The trial court denied the appellant's request. After deliberation, the jury found the appellant guilty of the felony murder of the victim during the perpetration of aggravated child abuse. The appellant was sentenced to life imprisonment. On appeal, the appellant raises the following issues: (1) whether the evidence was sufficient to support the appellant's conviction for felony murder; (2) whether the trial court erred in not granting the appellant's motion for judgment of acquittal; (3) whether the trial court erred in not granting the appellant's motion for a bill of

particulars; (4) whether the trial court erred in improperly allowing prior statements of the minor child, Rebecca, into evidence; (5) whether the trial court erred in allowing the State to recall Sergeant Duncan; and (6) whether the trial court erred in failing to instruct the jury on the lesser-included offense of facilitation of felony murder.[6]

## II. Analysis
### A. Bill of Particulars

The appellant argues that the trial court should have granted his pretrial motion for a bill of particulars. However, such motion and any proceedings related thereto are not included in the appellate record for our review.[7] Tennessee Rule of Appellate Procedure 24(b) is clear:

> [T]he appellant shall have prepared a transcript of such part of the
> evidence or proceedings as is necessary to convey a fair, accurate and
> complete account of what transpired with respect to those issues that
> are the bases of appeal.

The failure to follow the dictates of this rule results in the waiver of the related issues and allows this court to presume that the trial court was correct in its ruling. Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Accordingly, we will not address this issue.

### B. Recall of Duncan

The appellant complains, "[t]he trial court erred allowing the State of Tennessee to reopen the proof to allow [Sergeant] Floyd Duncan, Jr. to testify. . . . [Sergeant] Duncan was recalled to testify as to why he was distracted and why his testimony the day prior was suspect."

As we noted in the facts, Sergeant Duncan was the last witness to testify at trial on April 23, 2001. The next morning, the State requested the trial court's permission to recall Sergeant Davis to explain why he was "distracted" during the previous day's testimony. Additionally, the State wished to have Sergeant Duncan clarify when Amanda Davis left and returned to the home. The appellant objected to the recall of Sergeant Duncan. After a jury-out proffer, the trial court allowed Sergeant Duncan to be recalled for the sole purpose of establishing when Amanda Davis was absent from the home. Contrary to the appellant's assertion, on recall Sergeant Davis testified only concerning the appellant's statement that Amanda Davis left at 4:00 p.m. on September 23, 1999, and returned at 5:00 p.m.

This court has observed that "the decision of whether to reopen the proof for further evidence is within the discretion of the trial court, and the decision of the trial court will not be set aside unless there is a showing that an injustice has been done." State v. Brock, 940 S.W.2d 577, 580 (Tenn. Crim. App. 1996). In the instant case, the State had just concluded examination of Sergeant

---

[6] We shall address these issues in a different order than that in which they were raised.

[7] The sole mention in the record concerning the appellant's motion is an order of the trial court stating that "the Motion for Bills of Particulars is not well taken and should be denied." We take this opportunity to note that the State, not the appellant, directed our attention to this order. In contravention of Tennessee Rule of Appellate Procedure 27(a)(7), the appellant provided no such citation to the record.

Duncan the previous afternoon. The next morning, the trial court allowed a brief recall of Sergeant Duncan to clarify times which had been mentioned in his previous testimony. There has been no prejudice to the appellant in this instance. Accordingly, we conclude that the trial court did not abuse its discretion in permitting the State to recall the witness and as a result of the recall there was no injustice done to the appellant. This issue is without merit.

### C. Rebecca Pylant's Prior Statement

The appellant next contends that the trial court erred in allowing the State to use Rebecca Pylant's prior statement during her testimony and further erred when it allowed the contents of the statement to be used as substantive evidence. The appellant further contends that the statement fell under the auspices of Tennessee Rule of Evidence 613 regarding prior inconsistent statements. According to the appellant, the State did not lay a proper foundation under Rule 613 and, if the admission of the statement was proper,[8] the trial court should have instructed the jury that the statement could be considered for impeachment purposes only.

> Tennessee Rule of Evidence 613 provides:
> (a) In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.
> (b) Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Any prior inconsistent statement admitted under this rule should be used only for impeachment purposes; it should not be used as substantive evidence. Neil P. Cohen et al., Tennessee Law of Evidence, § 6.13[2][b], at 6-131 (LEXIS publishing, 4th ed. 2000). However, the inconsistent statement may be used as substantive evidence if it were admissible under some other rule of evidence. Id. at 6-132. From our thorough review of the record, we can find no instances where the State used Rebecca's prior statement to impeach her trial testimony. Moreover, we can discern no logical reason for the State to attack the credibility of the pivotal witness against the appellant.

However, another rule of evidence is applicable to the use of Rebecca's prior statement. Tennessee Rule of Evidence 612 is typically referred to as the rule governing present recollection refreshed. "For present recollection refreshed, the witness's memory is successfully restored and the witness testifies from present memory. This does not involve hearsay because the witness is not testifying about a prior statement, but rather is relating what is in the witness's current memory." Cohen, Tennessee Law of Evidence, § 8.10[2][b], at 8-92.

---

[8] We note that both the appellant and the State frame the argument in terms of the admission of the statement. This is not quite accurate. While some of the contents of the statement were discussed during the examination of Rebecca, the statement itself was never admitted into evidence.

The advisory commission comments to Rule 612 advise that "[o]nly if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory." Tenn. R. Evid. 612, Advisory Commission Comments. In other words, to justify the use of a writing to refresh a testifying witness's recollection pursuant to Rule 612, an attorney must demonstrate that it is necessary to refresh the witness's memory and that the writing will provide the necessary refreshing. See State v. Mathis, 969 S.W.2d 418, 421 (Tenn. Crim. App. 1997). Additionally, we note that a leading treatise has suggested that the necessary foundation "can be provided by the witness's incomplete testimony." Cohen, Tennessee Law of Evidence, § 6.12[4][b], at 6-128.

We acknowledge that during some instances of questioning, Rebecca did not maintain that she did not remember the events underlying the State's questions. However, in each instance in which her prior statement was used, it became obvious through Rebecca's testimony that she did not clearly remember the details of the events. The State asked Rebecca to read portions of her statement, and then asked Rebecca questions regarding the events mentioned in the part of the statement Rebecca just read. Rebecca was able to independently testify of her own recollection after her memory was refreshed by reading her previous statement. See State v. Carpenter, 773 S.W.2d 1, 10 (Tenn. Crim. App. 1989); State v. Stanley Lawson, No. 01C01-9607-CR-00320, 1997 WL 661483, at *8 (Tenn. Crim. App. at Nashville, Oct. 24, 1997). This is the type of situation envisioned by Rule 612. See Mathis, 969 S.W.2d at 421. Accordingly, we conclude that there was no error in allowing the State to refresh Rebecca's memory using her previous statement and, furthermore, there was no error in using Rebecca's testimony as substantive evidence. See State v. Harrison Pearson, No. 03C01-9802-CR-00076, 1999 WL 692877, at *5 (Tenn. Crim. App. at Knoxville, Aug. 31, 1999).

### D. Lesser-Included Offense

The appellant contends that the trial court erred in failing to instruct the jury on the lesser-included offense of facilitation of felony murder.[9] Notably, the appellant's entire argument on appeal is as follows:

> The Trial Court erred in not charging facilitation of Felony Murder in that the decedent's mother, Amanda Davis, was charged with Felony Murder in the superceding indictment. The proof was clear that Ms. Davis spanked the decedent child with a spoon prior to the Appellant arriving at the residence. State v. Fowler, 23 S.W.3d 285 (Tenn.[] 2000) and State v. Burns, 6 S.W.3d 453 (Tenn. 1999), warrants the lesser-included charge.

We note that a trial court's decision regarding whether to charge a jury regarding a lesser-included offense is a mixed question of law and fact, which decision this court will review de

---

[9] The trial court instructed the jury on the charged offense of felony murder in the perpetration of aggravated child abuse and on the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, criminally negligent homicide, aggravated child abuse, child abuse, aggravated assault, and assault.

novo with no presumption of correctness. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001). Interestingly, the record reflects that prior to the reading of the jury charge, the appellant requested that the trial court charge no lesser-included offenses. Nevertheless, the trial court correctly observed that it was required to charge the jury on the lesser-included offenses. Specifically, Tennessee Code Annotated section 40-18-110(a) (1997) mandates that a trial court must charge the jury as to the law of each offense which is "included" in an indictment, namely the charged offense and any lesser-included offenses, regardless of a defendant's request for such an instruction. "In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002). In Burns, 6 S.W.3d at 466-67, our supreme court outlined the test for determining when an offense may be considered a lesser-included offense of an indicted offense.

Burns specifically designates facilitation of the charged offense as a lesser-included offense. 6 S.W.3d at 467. In fact, our supreme court has explicitly acknowledged that facilitation of felony murder is a lesser-included offense of felony murder. State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001), cert. denied, 534 U.S. 979, 122 S. Ct. 408 (2001). Further, in State v. Locke, 90 S.W.3d 663, 672 (Tenn. 2002), our supreme court explained that

> [f]acilitation, however, unlike lesser degrees of homicide is not an immediately lesser offense of felony murder under part (b) of the Burns test. In fact, facilitation is a separate and distinct theory of liability from that of a principal offender or someone who is criminally responsible for the conduct of another.

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997). Moreover, in State v. Lewis, 919 S.W.2d 62, 68 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998), this court noted that

> knowledge of the specific felony required under Tennessee Code Annotated section 39-11-403 is met in a felony murder prosecution not by knowledge of the felony murder, but by the knowledge that the other person was going to commit the underlying felony. In the case *sub judice,* the Defendant could be guilty of facilitation of felony murder because he knew his co-defendant was planning on committing a robbery, which is the underlying felony of the felony murder.

Therefore, we must now determine whether the evidence supports an instruction on facilitation of felony murder.

A trial court is not required to charge an offense simply because it is a lesser-included offense of the charged offense. "Whether or not a particular lesser-included offense should be charged to the jury depends on whether proof in the record would support the lesser charge." Burns,

6 S.W.3d at 468. If the instruction is warranted by the evidence, the trial court must instruct the jury on all lesser-included offenses regardless of any theory proposed by either the defense or the State. State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002). In determining whether the lesser-included offense should be charged, "the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." Burns, 6 S.W.3d at 469.

In the instant case, we can find no facts which would support a charge of facilitation of felony murder. Rebecca testified that she saw Amanda Davis hit the victim with a spoon when she came home from school. The victim stopped crying after being struck. The appellant told Sergeant Duncan that he came home at about 4:00 p.m. or 4:30 p.m. and that Amanda Davis left shortly thereafter. Rebecca maintained that approximately thirty minutes after Amanda Davis left, the appellant changed the victim's diaper. After his diaper was changed, the victim continued to cry. According to Rebecca, the appellant went to the victim's bedroom and repeatedly and forcefully spanked the victim. Dr. Harlan explained that the victim's death occurred from blunt trauma to the back of his abdomen. Based upon the foregoing facts, there were two possible scenarios: a conviction based upon the appellant's guilt as principal or an acquittal. Fowler, 23 S.W.3d at 289. Thus, we conclude that there is no proof in the record that the appellant knew that Amanda Davis intended to commit aggravated child abuse on the victim and furnished substantial assistance in the commission of the aggravated child abuse without the intent required for criminal responsibility. See Tenn. Code Ann. § 39-11-403(a). Accordingly, the trial court did not err in failing to charge the jury on facilitation of felony murder.

### E. Sufficiency of the Evidence

In the appellant's final two issues, he questions whether the evidence adduced at trial was sufficient to support his conviction and he complains that the trial court erred in not granting his motion for judgment of acquittal. This court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Accordingly, we will address the appellant's final complaints as a challenge to the sufficiency of the evidence.

On appeal, the appellant, having been convicted by a jury, is presumed guilty. State v. Suttles, 30 S.W.3d 252, 260 (Tenn. 2000). Thus, the burden falls upon the appellant to demonstrate why the evidence is insufficient to support the jury's findings. Id. Evidence is considered insufficient when no reasonable trier of fact could have found the essential elements of the offense in question beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Moreover, as a result of the appellant's conviction, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cottrell, 868 S.W.2d 673, 675 (Tenn. Crim. App. 1992). Additionally, we note that "[t]he weight

and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact." State v. Manning, 909 S.W.2d 11, 13 (Tenn. Crim. App. 1995).

In order to sustain the appellant's conviction for felony murder, the State was required to prove that the appellant killed the victim in the perpetration of aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2) (1997). We note that "intent to kill is not required under the felony murder statute[; however], the perpetrator must possess the requisite intent to commit the underlying felony for a felony murder conviction to be sustained." State v. John Dennis Rushing, No. 01C01-9501-CR-00020, 1996 WL 63920, at *6 (Tenn. Crim. App. at Nashville, Feb. 13, 1996). In other words, a conviction of felony murder requires only a showing of a killing during the perpetration of an underlying felony and does not require premeditation or intent to kill. See Tenn. Code Ann. § 39-13-202(a)(2).

As we noted earlier, aggravated child abuse is the felony underlying the appellant's felony murder conviction. Aggravated child abuse is defined as the commission of child abuse when the "act of abuse results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1) (1997). A person commits child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a) (1997).

The proof adduced at trial demonstrated that the appellant became angry when the victim would not stop crying after Amanda Davis left the residence. The appellant changed the victim's particularly "foul smelling diaper" and yet the victim would not be quiet. The appellant hoisted the victim's arms over the victim's head and spanked the victim so hard that Rebecca could hear the blows from the living room. After the spanking, the victim did not come out of his room again. Dr. Harlan testified that the blows causing the child's death were hard enough to completely tear the root of the victim's mesentery. Upon questioning by the police, the appellant repeatedly denied spanking the victim on any occasion and staunchly maintained that Amanda Davis would not spank the victim because she did not "believe in whipping them." However, Rebecca testified that both the appellant and Amanda Davis had spanked the children. We conclude that this proof is sufficient to sustain the appellant's conviction. See State v. Hodges, 7 S.W.3d 609, 620-21 (Tenn. Crim. App. 1998).

We also note that the appellant complains on appeal that "[t]he State did not prove venue, the identity of the defendant or the age of the decedent child." We disagree. As we recounted in our recitation of the facts, numerous witnesses testified that the offenses occurred in Cheatham County, several witnesses indicated that the victim was two years of age, and the witnesses also designated "Dennis Pylant" as the appellant. See State v. Smith, 926 S.W.2d 267, 269 (Tenn. Crim. App. 1995) (explaining that venue need only be proved by a preponderance of the evidence); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987) (establishing that the jury as the trier of fact determines issues regarding witness credibility, the weight and value to be afforded the evidence and all accompanying factual issues); State v. Danny R. Morris, No. 01C01-9506-CC-00206, 1996 WL

233989, at *2 (Tenn. Crim. App. at Nashville, May 9, 1996) (stating that "[a] courtroom identification is not a prerequisite to a conviction for a criminal offense"). This issue is without merit.

### **III.  Conclusion**
Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE